MITCHELL v. METAL ASSEMBLIES, INC.

1. WORKMEN'S COMPENSATION—FINDINGS OF FACT—APPEAL.
   The obligation of the Supreme Court, in an appeal from a decision of the workmen's compensation commission appeal board, is to accept, without question, findings that are certified to the Supreme Court if there be any evidence whatever to sustain those findings, regardless of thought or suggestion addressed to the improbability thereof (CL 1948, § 413.12).

2. SAME—LOSS OF INDUSTRIAL USE OF HAND—QUESTION OF FACT.
   The issue in a closely disputed case of claim of workmen's compensation for loss of industrial use of a hand almost automatically becomes one of fact.

3. SAME—LOSS OF INDUSTRIAL USE—AMPUTATION.
   The original rule applied in cases of claim for workmen's compensation for loss of industrial use of a member is that no amputation in toto is required to entitle the appeal board to find as a fact that the amputee had lost the industrial use of a substantially amputated member.

4. SAME—LOSS OF HAND—PROOF.
   Proof of either outright loss of a hand or of loss of the industrial use of that hand entitles the appeal board to award compensation for loss of the use of the hand in a workmen's compensation proceeding.

5. SAME—LOSS OF INDUSTRIAL USE OF HAND—GRASPING FUNCTION.
   The human hand consists of the palm, fingers, and thumb, being a combination peculiarly adapted physiologically to the function of prehension, or grasping, which is their primary service,

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur, Workmen's Compensation §§ 530–534.
[2] 58 Am Jur, Workmen's Compensation §§ 287, 288.
[3–5] 58 Am Jur, Workmen's Compensation §§ 287, 288.
[6] 20 Am Jur 2d, Courts § 231.
[7] 58 Am Jur, Workmen's Compensation § 288.
[8] 5 Am Jur 2d, Appeal and Error § 1010.

locomotion and support being of scant importance; hence, where the grasping function of plaintiff's right hand was lost, the workmen's compensation appeal board properly found that he had lost the industrial use of the hand (CL 1948, § 413.12).

6. Courts—Overruled Cases.

The case of *Hlady* v. *Wolverine Bolt Co.*, 325 Mich 23, which now appears to have been hurriedly decided by the Supreme Court, which was without precedential support and which appears to have been directly overruled by a subsequently decided case is declared to be overruled.

7. Same—Loss of Industrial Use of Hand—·Finding of Appeal Board.

Finding of the workmen's compensation appeal board that a claimant who had lost all 4 fingers of his right hand in an industrial accident, and had thereby lost his capacity to grasp, had suffered industrial loss of use of his right hand, *held*, supported by the evidence in the record (CL 1948, § 413.12).

8. Costs—Workmen's Compensation Appeal Board—Court of Appeals—Supreme Court.

Costs of appeal in both the Supreme Court and the Court of Appeals are awarded plaintiff employee, where Supreme Court directs that an order affirming the workmen's compensation appeal board upon reversal of Court of Appeals be entered.

Appeal from the Court of Appeals, Division 2; J. H. Gillis, P.J., and Fitzgerald and Watts, JJ., reversing the Workmen's Compensation Appeal Board. Submitted April 11, 1967. (Calendar No. 2, Docket No. 51,490.)   Decided July 21, 1967.

3 Mich App 143, reversed.

David Mitchell presented a claim for workmen's compensation against Metal Assemblies, Inc., and Exchange Casualty & Surety Company (In Liquidation) for a specific loss of 4 fingers. Compensation awarded. On application for adjustment of claim, compensation awarded for loss of hand. Award affirmed by Workmen's Compensation Appeal Board. Award reversed by Court of Appeals. Plaintiff ap-

peals. Reversed, with instructions to enter an order affirming the award as made by the Workmen's Compensation Appeal Board.

*Miley & Fox (James R. Fletcher,* of counsel), for plaintiff.

*Levin, Levin, Garvett & Dill (Edward M. Miller,* of counsel), for defendant Metal Assemblies, Inc.

Per Curiam. The sole question on review by the Court of Appeals, and in turn here, is "whether there is any evidence to support the award." *Meyers* v. *Michigan Central R. Co.,* 199 Mich 134, 137, 138; *Thornton* v. *Luria-Dumes Co-Venture,* 347 Mich 160, 162; *Coates* v. *Continental Motors Corporation,* 373 Mich 461, 467. "Our obligation is to accept, without question, findings that are certified here if there be any evidence whatever to sustain those findings, regardless of thought or suggestion addressed to improbability thereof."[1] (*Thornton* at 162.)

The appeal board found, with ample evidentiary support:

"In the instant case all four fingers which were opposed to the thumb have been amputated. Since the capacity to grasp comes from the fact that the phalanges are opposable, it follows then that the capacity to grasp is destroyed. It is true that plaintiff can hold some objects by using the thumb in conjunction with the palm or surface of the hand. However, this is more in the nature of a holding action similar to that which might be accomplished by sticking an object between the phalanges of the paw of the performing dog. Plaintiff herein is left with little, if any, more than a pushing instrument. His capacty to use the forelimb to any degree depends upon the other parts of the forelimb. While the forelimb is not completely useless, it is of less use

---

[1] CL 1948, § 413.12 (Stat Ann 1960 Rev § 17.186).—Reporter.

than a forelimb fitted with a modern prosthetic hand. Plaintiff is relegated to the ranks of the odd lot who must substitute other bodily functions for that destroyed in order to continue to be gainfully employed. We hold that he has suffered industrial loss of use of his hand. The order of the referee shall stand affirmed."

As against these findings the seated panel of the Court of Appeals reversed the appeal board's award for plaintiff, stressing an opinion of the defendant employer's examining physician ("I do not think he's lost the industrial use of his hand."). Holding that the presented question "becomes one of law," and citing *Hlady* v. *Wolverine Bolt Co.*, 325 Mich 23, as controlling authority, the 3 judges came to this specific conclusion:

"While it might seem harsh to find that a man who has lost 4 fingers of his right hand has not, in absence of evidence of any greater injury, lost the industrial use of that hand, such is the law. To change the law is the province of the legislature, not of this Court." (*Mitchell* v. *Metal Assemblies, Inc.*, 3 Mich App 143, 150).

Before turning to the proof upon which the appeal board depended, and from there to the authorities with which we are concerned, it should be noted that the hearing referee and the appeal board ignored the quoted opinion of defendant's medical witness. Whether that was done for reasons of credibility, or for some other reason or reasons, is not disclosed. It may be that the administrative triers of fact concluded that the doctor's knowledge of essential facts was a bit scarce, the doctor having testified:

*"The referee.* Let me put it in converse, Doctor. How much would you say loss of use has there been here?

"*A.* I would have to say that that depends upon the use for which the hand—I mean, industrially speaking, it depends upon the type of use that the hand has been used to. And to actually go on percentages I would say is impossible. Each individual is different. They each can adapt themselves differently. Some people have abilities with their hands and are double jointed and so on, so that it's hard to measure exactly everyone based on a simple percentage.

"I would say that I haven't seen this man before and not knowing his capabilities, it would be hard for me to give a percentage loss as far as his hand is concerned. I can't say how well he does his job. I have never seen him do it. I did see him flex his hand and extend it. I saw him move his thumb. I would say as far as those uses are concerned, that he does very well with what he has left.

"*The referee.* Well, let's put it this way. If you were the examining physician, you were passing upon prospective employees for two-handed jobs, where would he stand?

"*Mr. Leib:* If the court please, I'm going to object to the question by the court. I think it's highly irrelevant.

"*The referee.* Well, I'd like to have an answer to it.

"*A.* It would depend upon whether the job demanded the dexterity of his fingers. If the job did not—many jobs can be done by just pushing with your palm. If the job demanded dexterity of his fingers, if he had to do emergency work in the hospital like I do, I would say no. I don't know what his job is."

So far as lifeless print may disclose to a reader thereof, the plaintiff appears to have been remarkably straightforward in giving the testimony upon which the appeal board relied. Unlike the exact situation disclosed in the *Hlady Case* (see discussion, *post*), it was shown that plaintiff "suffered

complete loss of the little finger, ring finger, middle finger and about four-fifths at least of the index." He told of going back to "part-time" work on a garbage route; then with a "floor cleaning fellow"; and finally as a "maintenance man." He said "I sweep up the floor and clean the bathroom and change light bulbs, whatever has to be done"; "fix the machines, put saws in, I mean blades, yes, saw blades, and I do truck driving, high-low."[2]

A fair summary of the extent of the use to which he can employ what is left of his right hand appears from this connected part of his testimony:

"Q. Are you able to get along on the job or did you have any special favoritism shown to you, or how do you manage?

"A. No, I get along fine as far as I know on the job I'm on now. As far as I know everybody likes me, as far as I know. Nobody says anything to me, I just do my job and that's it.

"Q. I'm talking about your ability to perform your work, are you able to do it all right?

"A. Well, as far as sweeping and cleaning up and like that there, yes, sir.

"Q. How do you do it?

"A. Well, I have a broom and brushes, and Ajax, and stuff like that, I use to clean out the bowls. The only thing I have a hard time with is picking the barrels up and stuff like that, but I do get them up and hold them up there. A lot of times I bang my hand where I wouldn't otherwise, and I could just jump through the ceiling then, but other than that everything's fine.

"Q. Is there any work you were doing before your injury that you are unable to do at this time?

"A. Well, I mean I was doing punch press before and, well, I mean other than doing the punch press, I mean I could do most anything, you know, but

2 "High-low" was subsequently shown as referring to fork-lift floor conveyor trucks.

there's a lot of little things I can't do. Like if I
I wanted to fix it on my car or work on my car, or
something like that, I can't get down in there and
hold the wrenches and stuff.

"*Q*. Well, could you go back and work on the same
punch press again?

"*A*. No, sir.

"*Q*. Do you know why?

"*A*. Well, I think it's because one man couldn't
operate it with one hand, you have to have two
hands to operate it.

"*Q*. Do you know whether or not you have ever
been refused work because of your injured hand?

"*A*. Well, yes, I've applied for kitchen work and
stuff like that, and they wouldn't hire me because
of that; they told me right out that I'd probably
drop the stuff and break it and I wouldn't be no
good in the kitchen, and I have been refused work
because of that.

"*Q*. Have you done that kind of work before?

"*A*. Yes, sir.

"*Q*. Can you tell us where you were refused employment?

"*A*. I don't remember the place but it's in Rochester; it was a high class restaurant and I went in
and talked to the lady, and she asked me if I was
physically fit and everything and I told her I was
physically fit other than my hand, and she looked at
my hand and she said I'm sorry, I can't use you
because you'll drop the dishes, you couldn't pick
this up or carry a bucket, or anything like that. So
I do forget the name right offhand, but it was right
up in Rochester. I could find out.

"*Q*. Have you had any medical attention on your
hand?

"*A*. Yes, I have. I had to go back one time before
when I come out of the hospital, and he cut a little
more bone off of here, but it still does bother me
right here.

"*Q*. You're pointing to the knuckle of your long
finger?

"*A.* Well, I guess it's the bone down here, I guess where he squeezed it down or something, but it's nerves, the nerve right there, and I can—I mean I can feel it all the time, you know, and it bothers me, and I talked to the doctor about it and I told him that the company did go bankrupt, and he told me wait until I got settled.

"*Q.* Who was the doctor?

"*A.* Doctor Beech, the doctor.

"*Q.* Is he the one who took care of you before?

"*A.* Yes, sir.

"*Q.* Now, are you pointing to that portion of the hand where you've lost the middle finger?

"*A.* Yes, sir, the middle part right here.   The biggest part, this part down here doesn't bother me as much as this does here, but he cut part of this bone off and he said I'd probably have to go back quite a few times before he could cut it all off, because he could only cut a portion off at a time."

This brings us to application of the "any evidence" rule, whether there is any evidence on strength of which the appeal board could rightfully find and conclude as it did.

In the first place it is rather firmly settled that, in this particular type of closely disputed "loss of industrial use" case, the issue almost automatically becomes one of fact.   See *Powers* v. *Motor Wheel Corporation*, 252 Mich 639.; *Rench* v. *Kalamazoo Stove & Furnace Co.*, 286 Mich 314;[3] *Lentz* v. *Mumy Well Service*, 340 Mich 1; *Rupp* v. *Hutter Construc-*

---

[3] "It is argued that we should not permit recovery for the loss of industrial use of the hands in absence of definite legislative enactment. However, our holding of industrial loss of use is well established. See *Lovalo, Powers,* and *West*\* *Cases, infra,* and also *Suggs* v. *Ternstedt Manfg. Co.*, 232 Mich 599; also *Lindhout* v. *Brochu & Hass,* 255 Mich 234.

"As in the *Powers Case, supra,* the determination of the loss by plaintiff of the industrial use of his hands is one of fact and, there being testimony to support such a determination, the findings of the department are binding upon us." (*Rench* at 320).

\* See *West* v. *Postum Co., Inc.* (1932), 260 Mich 545,—REPORTER.

*tion Co.*, 288 Mich 105; *Shumate* v. *American Stamping Company*, 357 Mich 689.

In the second place we "noted," in *Palazzolo* v. *Bradley*, 355 Mich 284, 290, that "Michigan was once on the right track", the "right track" being regular application by this Court of its original rule that no amputation *in toto* is required to entitle the appeal board (formerly board and then commission) to find as a fact that the amputee had lost the industrial use of a substantially amputated member.[4] Our most recent word on this appears in the *Palazzolo Case*. The rule there approved will bear repeating, along with a new declaration of adherence thereto. It comes from the pen of Mr. Justice FELLOWS, writing for a unanimous Court in *Reno* v. *Holmes*, 238 Mich 572, 574, 575:

"Of our own cases, the one nearest in point is *Stocin* v. *C. R. Wilson Body Co.*, 205 Mich 1. Noting the diagram appearing in that case, it will be seen that the amputation was a short distance below the elbow. We there held that the words used in the act should be given their ordinary and accepted meaning, and, giving them such meaning, we held that there had been the loss of an arm. The supreme court of Massachusetts made a similar holding in *Garcelon* v. *Commercial Travelers' Eastern Accident Association*, 184 Mass 8 (67 NE 868, 100 Am St Rep 540), in construing the words 'loss of an arm,' in an insurance policy. The amputation was at a point about four inches below the elbow, and it was said:

[4] Of course, if the statute specifically provides otherwise, then the loss-of-use rule does not apply. For debate of this point in the factual setting of Palazzolo, see both opinions of that case, one by Justice DETHMERS for affirmance and the other by Justice T. M. KAVANAGH for reversal. Justice DETHMERS posed the debated question nicely (*Palazzolo* at 285):

"Does 'loss of the first phalange of the thumb,' as provided in the statute, mean physical loss or does loss of industrial use meet the test?"

" 'We consider the amputation of an arm a little below the elbow to be the loss of an arm in the common acceptation of those words and within their meaning as used in the policy, which specifies merely the "loss of an arm" without mentioning whether the loss is by amputation below or above the elbow joint.' * * *

"The diligence of counsel has brought to our attention but one case dealing with the precise question before us. *Payne* v. *Industrial Commission*, 296 Ill 223 (129 NE 830). In the time at our disposal we have found no others directly in point. In this case the amputation was at a point about 10 inches above the ankle joint. It was held (we quote from the syllabus):

" 'The loss of any substantial portion of a leg constitutes the loss of the leg within the meaning of the compensation act, and the necessary amputation of the leg 10 inches above the ankle joint will entitle the employee to compensation for loss of the leg.'

"It will be noted that the amputation in that case was at practically the same point as it was in the instant case, and while the language of the Illinois act is not identical with ours, the language differing from ours was not stressed in the opinion, but the broad holding was made that the loss of a substantial portion of the leg was the loss of the leg. We are persuaded that we should follow that holding. To hold that one had lost only a foot unless the leg was amputated at the extreme upper part would not comport with the common acceptance of the language used by the legislature or the beneficent purposes of the act."

From here attention is turned to the *Hlady Case, supra*. It is not to be denied that, if we are duty bound to apply it, *Hlady* stands in the way of this award. Ordinarily we would follow such an authority, even though the rather abrupt *dixit* thereof leaves something to be desired. Why? Because it

leaves an open inference that the decisions cited to the Court at the time (*Lovalo* v. *Michigan Stamping Co.*, 202 Mich 85; *Powers* v. *Motor Wheel Corporation*, 252 Mich 639; *Rench* v. *Kalamazoo Stove & Furnace Co.*, 286 Mich 314 and *Rupp* v. *Hutter Construction Co.*, 288 Mich 105) were slighted purposely in favor of a new and theretofore unknown test-doctrine, that is (*Hlady* at 26):

· · "As a matter of law the commission's award to plaintiff for the loss of a hand was erroneous, because there was no testimony that plaintiff's injury was other than the loss of 4 fingers of her right hand which resulted in no more than the normal impairment of industrial use which must always follow such amputations, or at least naturally and commonly results."

The trouble with *Hlady* is that it stands by itself in the midst of earlier and subsequent decisions which adhere to the more flexible, and manifestly more desirable, rule that a claim of industrial loss of use of a hand or other member is not (excepting where specifically applicable statutory language says otherwise) to be judicially determined contrary to supported factual findings of the appeal board. Proof of outright loss of a hand is one thing. Proof of loss of the industrial use of that hand is something else. Proof of either entitles the appeal board to award compensation for loss of industrial use of the hand. In the factual setting of this Mitchell Case, the board found that the loss of all four fingers of the right hand left Mitchell where he had "suffered loss of use of his right hand." In *Hlady* the commission found the same way on like proof.

Now let us view the commission's concluding view of *Lovalo* and the relation of that case to *Hlady* (p 57 of *Hlady's* printed record):

"In the case of *Lovalo* v. *Michigan Stamping Co.,*
202 Mich 85, the Court said,

" 'In common terms the human hand consists of
the palm, fingers and thumb, being in combination
peculiarly adapted physiologically to the function of
prehension, or grasping, which is their primary
service, locomotion and support being of scant im-
portance as contradistinguished from the lower or-
der of animals. In that sense and for such uses
plaintiff has lost his right hand.'

"Applying the test described in the above case
it is self-evident that the plaintiff has lost the pri-
mary service of her right hand. The plaintiff has
no useful grasping function in her right hand and
it is obvious from a look at the photographs that
no one would undertake to employ her at anything
but a one-handed job. We, therefore, find that the
plaintiff has lost the industrial use of her right
hand as the result of her amputations of October
18, 1945. We believe she is entitled to compensation
for the loss of such hand. The fact that the amputa-
tions do not involve any portion of the hand beyond
the 4 fingers does not warrant an opposite conclu-
sion."

Due advertence to the earlier cases has been made.
As to the subsequent ones, compare *Hlady* with
*Lentz* v. *Mumy Well Service* and *Shumate* v. *Ameri-
can Stamping Company,* both *supra,* the latter citing
*Lentz* in support of this conclusion (p 692).:

"In the present appeal, the record sustains the
same finding as in the *Lentz Case,* namely: 'At most
its use (the hand) is limited to that of an unsatis-
factory pushing or pulling instrumentality.' "

If the Court were disposed to distinguish *Hlady*
from this case of Mitchell, rather than overrule
*Hlady,* it would not be difficult to make a factual hair
split between the two cases. Mr. Mitchell has left
on his right hand but two insignificant stumps of

fingers, one of which will require progressively additional amputation (see testimony quoted above); whereas Mrs. Hlady had left 4 stumps of fingers, all longer than those left to Mitchell with one stump extending into the middle phalange. This latter fact appears photographically opposite page 52 of the *Hlady* printed record.

But daintily quartered distinctions and artificial differences are not in order here. *Hlady* was simply a hurriedly considered *nullius filius* in the annals of the Supreme Court of Michigan. No decision was cited in support of that reversal of a factually supported award of compensation. Nor were any of the decisions of this Court, standing at the time "on the right track," mentioned or even inferably distinguished. *Hlady* must in these circumstances be taken as one of those cases the principle of which, contrary as it has always been to *Reno* v. *Holmes, supra*, was directly overruled by what was said in *Palazzolo* v. *Bradley, supra*, at 291. The Court should say so.

Reversed, with instruction that an order enter affirming the award as made to plaintiff. Plaintiff will have costs of both courts.

DETHMERS, C. J., and KELLY, BLACK, T. M. KAVANAGH, SOURIS, O'HARA, ADAMS, and BRENNAN, JJ., concurred.