PIPE v LEESE TOOL & DIE COMPANY

Docket No. 63435. Argued May 6, 1980 (Calendar No. 5).—Decided
March 10, 1981.

Frederick J. Pipe claimed workers' compensation benefits for the
loss of a hand against his employer, Leese Tool & Die Com-
pany, and its insurer, Liberty Mutual Insurance Company. The
plaintiff was working as a diemaker when his right hand was
caught in a large press. As a result of the injury it became
necessary to amputate his first and second fingers, his thumb
was severely stiffened, and he underwent extensive surgical
grafts to repair the hand. He returned to work, performing
duties other than those he performed before the injury, and the
actions that had required the use of his right hand were
transferred to his left hand. A physician who specialized in
hand surgery testified that he estimated that the plaintiff's
anatomical loss of his hand was 86 percent, and that he
retained no "power grasp", had some "precision grasp", had no
"pinch" and had some remaining "push and hook". The Work-
ers' Compensation Appeal Board affirmed an award of benefits
for loss of the hand. The Court of Appeals, D. E. Holbrook, Jr.,
P.J., and R. B. Burns and M. J. Kelly, JJ., reversed on the
ground that the plaintiff's injury did not amount to loss of
function equal to actual physical loss as by destruction or
amputation of the hand (Docket No. 77-4817). Plaintiff appeals.
In an opinion by Justice Moody, joined by Justices Kavanagh,
Williams, Levin, and Fitzgerald, the Supreme Court *held:*

1. There appears to be a remarkable consistency in the
appellate decisions of this state involving claims of specific-loss
benefits for the loss of industrial use of a hand. In early cases,
the Court rejected amputation *in toto* as the only standard of
qualification for benefits, and approved as the standard the loss
of substantially the entire usefulness of the hand, so that for
all practical purposes the claimant has lost the entire hand.
After following the twofold standard for almost 30 years, the
Court in 1949 abruptly switched its focus exclusively to the

REFERENCES FOR POINTS IN HEADNOTES

[1, 3-5] 82 Am Jur 2d, Workmen's Compensation §§ 289, 340 *et seq.*
[2, 4] 82 Am Jur 2d, Workmen's Compensation § 547.

plaintiff's anatomical loss, ignoring its prior holdings that loss of industrial use could also be shown by the substantial loss of use in industry of the "primary service" of the hand. That decision was an aberration which was not rigidly adhered to by the Court and which was specifically overruled in 1967.

2. In 1968, the Court stated in dictum that the test is not the degree of loss measured by the requirements of the particular skilled trade of the injured person, but the degree of loss as compared with the actual physical loss by destruction or amputation; a number of decisions of the Court of Appeals have incorrectly interpreted that dictum to require a showing of a physical loss tantamount to amputation, and made the assumption that the Supreme Court had *sub silentio* overruled its earlier decisions on the industrial-use standard.

3. The fact that the 1968 decision may have been subject to misinterpretation does not require that the Court establish a new test of qualification for specific-loss benefits for the loss of a hand. The standard is a realistic and practical test: for purposes of qualification for specific-loss benefits for loss of a hand, there must be a showing of either anatomical loss or loss of the industrial use of the hand as determined by the loss of the primary service of the hand in industry.

4. In this case, there is no question that the plaintiff meets the test. By the direct testimony of the expert witness, he has suffered an 86 percent anatomical loss to his right hand. The Workers' Compensation Appeal Board found that the hand has no significant "power grasp", some "precision grasp", no significant "pinch", and some "hook and push". Additionally, the plaintiff testified that he is able to make little or no use of his right hand in the industrial setting in which he works. In effect, although retaining some function, he has lost the primary service of the hand. For all practical purposes, it is a substantial loss of the entire usefulness of the hand and, thus, qualifies the plaintiff for benefits for the loss of his right hand.

The judgment of the Court of Appeals is reversed.

Chief Justice Coleman, joined by Justice Ryan, concurred in the result but did not agree with the legal standard stated by the Court. The proper standard for entitlement to specific-loss benefits for the loss of a hand is whether the employee has suffered an anatomical loss equivalent to an amputation or the loss of the industrial use of the hand. The standard consistently applied by the Supreme Court is whether the employee has lost the industrial use of the hand, not whether the employee has lost the primary service of the hand in industry. Although some statements have been made in opinions concerning a loss

of primary functions, they were dicta rather than the legal standard used to resolve the case. If the Court is giving the same standard a new name, that will only hinder the development of a clear rule of law. If the loss of primary service in industry is intended to be something other than a loss of industrial use, the meaning of that standard cannot be discerned. Furthermore, there is a serious question whether the case law would support the adoption of any standard other than a loss of industrial use. When that standard is applied to the facts found by the Workers' Compensation Appeal Board, the award of benefits is not subject to reversal.

90 Mich App 741; 282 NW2d 462 (1979) reversed.

### Opinion of the Court

1. Workers' Compensation — Specific Loss — Loss of Hand.

Qualification for an award of specific-loss benefits for the loss of a hand requires a showing of either anatomical loss or loss of the industrial use of the hand as determined by loss of the primary service of the hand in industry (MCL 418.361[1]; MSA 17.237[361][1]).

2. Workers' Compensation — Specific Loss — Loss of Hand.

Whether a claimant of specific-loss benefits has suffered the loss of industrial use of a hand is almost automatically an issue of fact for the Workers' Compensation Appeal Board (MCL 418.361[1]; MSA 17.237[361][1]).

3. Workers' Compensation — Specific Loss — Loss of Hand.

A claimant who was working as a diemaker when his right hand was caught in a large press qualifies for specific-loss benefits for the loss of a hand where there was expert medical testimony that he suffered an 86 percent anatomical loss of the hand, the Workers' Compensation Appeal Board found that the claimant had suffered a loss of the industrial use of the hand and that the hand has no significant "power grasp", some "precision grasp", no significant "pinch", and some "hook and push", and the claimant testified that he is able to make little or no use of the hand in the industrial setting in which he works (MCL 418.361[1]; MSA 17.237[361][1]).

### Concurring Opinion by Coleman, C.J.

4. Workers' Compensation — Specific-Loss Benefits — Loss of Hand.

*A person claiming workers' compensation specific-loss benefits for the loss of a hand must show either an anatomical loss equal to*

an amputation or the loss of the industrial use of the hand
(MCL 418.361[1]; MSA 17.237[361][1]).

5. WORKERS' COMPENSATION — SPECIFIC-LOSS BENEFITS — LOSS OF
    HAND.

The standard consistently applied by the Supreme Court to test
entitlement to specific-loss benefits for loss of a hand is whether
the employee has lost the industrial use of the hand, not
whether the employee has lost the primary service of the hand
in industry (MCL 418.361[1]; MSA 17.237[361][1]).

*Reamon, Williams, Klukowski, Wood & Drew,
P.C.,* for plaintiff.

*Smith, Haughey, Rice & Roegge* (by *Lance R.
Mather)* for defendants.

BLAIR MOODY, JR., J. We granted leave in this
case to consider two questions:

1) Whether the Workers' Compensation Appeal
Board or the Court of Appeals correctly applied
the standards set forth in *Hutsko v Chrysler Corp,*
381 Mich 99; 158 NW2d 874 (1968), and in *Mitch-
ell v Metal Assemblies, Inc,* 379 Mich 368; 151
NW2d 818 (1967), in this matter, and

2) Whether this Court should adopt a different
standard and, if so, whether the plaintiff would
qualify under such a standard.

We conclude that (1) the Workers' Compensation
Appeal Board correctly applied the *Mitchell* and
the properly interpreted *Hutsko* standards and
reverse the Court of Appeals; and (2) there is no
present need for a different standard.

## FACTS

In 1946, plaintiff, Frederick J. Pipe, was em-
ployed by defendant, Leese Tool & Die Company,
as an apprentice diemaker. Shortly thereafter,
plaintiff earned a journeyman diemaker's card.

During plaintiff's employment with defendant, defendant manufactured large dies for the automotive industry. Plaintiff's duties as a diemaker included primary layout, machine work distribution, and detail assembly and finishing. During the course of his work, plaintiff was required to handle a number of hand and machine tools, including hammers, screwdrivers, micrometers, height gauges and radial drill presses.

On March 10, 1970, plaintiff's right hand was caught in a large press. As a result of this event, plaintiff suffered an almost complete circumferential laceration of his right hand together with multiple fractures of the bones in the hand and a number of other lacerations. Plaintiff was hospitalized for an extended period. During his hospitalization, it ultimately became necessary to amputate his first and second fingers. Later, plaintiff's thumb became severely ankylosed. Finally, surgery was required to place a pedicle graft over the dorsal ulnar aspect of the hand and also over the carpal-metacarpal joint of the thumb.

On May 27, 1970, plaintiff returned to work. According to plaintiff, although he continued in the classification of diemaker, he no longer could perform all of his prior duties. For the most part he performed bench work. Plaintiff indicated that he had lost 95 percent of the function of his right hand and activities that required the use of his right hand could no longer be performed by that hand but were transferred to the left hand.

Subsequent to his return to work, plaintiff was paid workers' compensation benefits by Liberty Mutual, defendant's insurance carrier. Benefits

were paid for 71 weeks, the statutory period applicable to specific loss of the first and second fingers under MCL 418.361(1); MSA 17.237(361)(1).[1]

Plaintiff continued to work for defendant until October 1, 1972, when defendant ceased to do business. After a period of layoff, plaintiff obtained work at Michigan Machine. Plaintiff indicated that the work he performed at Michigan Machine was considerably lighter than the work he performed for defendant and that very little of his work involved diemaking.

On April 4, 1974, plaintiff filed a petition for hearing with the Bureau of Worker's Compensation, claiming specific-loss benefits for loss of industrial use of his right hand. At a hearing held on December 24, 1974, plaintiff testified as follows

[1] MCL 418.361(1); MSA 17.237(361)(1), reads in pertinent part:

"(1) While the incapacity for work resulting from the injury is partial, the employer shall pay, or cause to be paid to the injured employee a weekly compensation equal to 2/3 of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter, but not more than $64.00 if such injured employee has no dependents; $69.00 if 1 dependent; $75.00 if 2 dependents; $81.00 if 3 dependents; $87.00 if 4 dependents; and $93.00 if 5 or more dependents; except as provided in section 355. Compensation shall be paid for the duration of the disability. In cases included by the following schedule, the disability in each such case shall be deemed to continue for the period specified, and the compensation so paid for such injury shall be 2/3 of the average weekly wages for the loss of the following:

"(a) Thumb, 65 weeks.

"(b) First finger, 38 weeks.

"(c) Second finger, 33 weeks.

"(d) Third finger, 22 weeks.

"(e) Fourth finger, 16 weeks.

"The loss of the first phalange of the thumb, or of any finger, shall be considered to be equal to the loss of 1/2 of such thumb or finger, and compensation shall be 1/2 of the amounts above specified.

"The loss of more than 1 phalange shall be considered as the loss of the entire finger or thumb. In no case shall the amount received for more than 1 finger exceed the amount provided in this schedule for the loss of a hand.

* * *

"(h) Hand, 215 weeks."

as to the use he made of his right hand on his present job:

"*Q.* Would you please explain for us the principal functions of your right hand in your present job?

"*A.* Hooking and pushing. I can hook. I can push; and if it's a very small object, I can prop it in between the digits.

\* \* \*

"*A.* The digits on my hand are almost nonfunctional. I have very little control of them, and they are set and fused in most of the joints. What little function is left, I prop things in between for—with my left hand, and then I can use them. It's basically—I—I suppose if it was a mechanical hand, you would do the same thing.

"*Q.* Tell me this, Mr. Pipe: disregarding for the moment the use of your left hand, what, if any, portions of your work can you perform independently with the right hand without any assistance from the left hand?

"*A.* I wouldn't get anywhere. I—I would—I would say 95 percent of my function is with my left hand."

Also introduced at the hearing was the testimony of Dr. Albert Van't Hof, an industrial surgeon who specialized in hand surgery, who had examined the plaintiff on two occasions at the request of Liberty Mutual. The doctor testified to the following findings:

"*Q.* Doctor, could you give us a brief physical description of this man's hand as it exists today?

"*A.* This man has three remaining digits; the thumb, on the first examination, had a small amount of motion at the metacarpal-phalangeal joint which was 15 degrees instead of the usual 40 to 50, and the interphalangeal joint 35 degrees instead of the usual 60 to 80 degrees. The last examination he'd lost all motion in

the metacarpal-phalangeal joint of the thumb, therefore this was zero instead of 35 degrees—15 degrees as first reported on the first examination. The motion in the other fingers was essentially the same. This, on the present examination, therefore, he has no motion. We'll discuss the ring finger first. He has no motion at the metacarpal-phalangeal joint, this being fixed at 145 degrees. Normal motion here is 90 degrees. At the proximal-interphalangeal joint of the same digit, he has 25 degrees, normal is 90 degrees. And at the distal-interphalangeal joint, showed approximately 20 degrees, normal being 50 to 60 degrees. The ring finger, he showed 80—approximately 80 percent motion, active, at the metacarpal-phalangeal joint; all of these measurements I gave, I'm sorry, are active. At the proximal joint of the small finger, it's 30 degrees instead of the usual 90 degrees, and at the distal-interphalangeal joint, 20 degrees instead of the usual 50 to 60 degrees. He could flex the pulp of the ring finger to within 7 centimeters of the distal palmar crease, and of the small finger to within 5 centimeters of the distal palmar crease, and he had some motion in the m.p. joint of the thumb, so that he could—he would have a distance of about 1-1/2 to 2 centimeters between the thumb, which is severely ankylosed, and having a very slight motion at the m.p. joint, and the joint of his—the palm of the hand. Sensation, though, normal in the remaining thumb, ring and small fingers. Adduction, of course, was greatly impaired or absent, opposition likewise, was absent.

"*Q.* Doctor, you have reached a computation of a percentage of *anatomical loss* of this man's hand, have you not?

"*A.* Yes.

"*Q.* And that is *86 percent?*

"*A.* This is what I estimated it to be."

The doctor testified further regarding the functional usefulness of plaintiff's right hand, saying that plaintiff retained no power grasp, had some

precision grasp, had no pinch and had some remaining push and hook.[2]

On May 12, 1975, the administrative law judge found that plaintiff was entitled to benefits for the specific loss of his right hand. On appeal, the

---

[2] Regarding the specific functions of power grasp, precision grasp, pinch, and push and hook, Doctor Van't Hof testified as follows:

"A. Grasp is prehension, and can be considered two areas. One can have power grasp, or precision grasp.

"Q. Would you define those two types of grasps?

"A. The power grasp is, I think, should be considered as a grasp between the flexed fingers and the palm, where one can hold objects and make a definite grasp on objects between flexed fingers and the palms.

"Q. Did you evaluate Mr. Pipe's hand for power grasp?

"A. I did.

"Q. And what did you conclude?

"A. I did not feel there was any significant remaining power grasp.

"Q. Would you define precision grasp for us?

"A. I think precision grasp is defined as—which held thin objects, as a rule, which can be done, say, between the opposing thumb and the side of the finger. In this case it was the ring finger, where he had some precision grasp, and enough so apparently that he said he at times could do some writing. And I think another remaining precision grasp, essentially, in this patient, is between the thumb and the palm, if he has objects which are light, and perhaps from no less than 1-1/2 or 2 centimeters in diameter, because of the slight increase—the slight motion that he has in the—in the distal joint of his thumb, he might be able to retain that type of objects, and I would consider this as a precision grasp.

"Q. Now, doctor, what is pinch?

"A. Pinch, of course, would be—I think is defined as an opposition of the thumb, the palmar side of the thumb to the various digits, and can be classified as tip pinch, pulp pinch, and lateral pinch.

"Q. What, if any, pinch function has Mr. Pipe retained?

"A. I don't think he had any, unless we get into the area of wanting to possibly consider, which I would prefer to call prehension grasp, between the thumb and the remaining ring finger, because it doesn't involve the pulp or the tip of the finger, but in essence, this is what we would—what he would do to retain thin objects between these two digits.

"Q. And what is hook and push mechanism?

"A. Well, a hook and push would simply imply, I think it's useful only to complement the function of the uninjured other hand, where one would aid in pushing objects, and in the same way, be able to place the palm of his hand to pull, aiding in pulling towards you. I think there is some remaining push and hook."

WCAB affirmed, applying the legal standard announced in *Hutsko.*

The Court of Appeals reversed. The Court held that the WCAB had failed to properly apply the *Hutsko* standard because "plaintiff retained some functions of the hand that would not have been present had the hand actually been amputated". 90 Mich App 741, 746; 282 NW2d 462 (1979).

## DISCUSSION

### I

In order to place the present controversy in proper perspective, it is necessary to trace the history of a series of appellate decisions of this jurisdiction, all involving claims for specific-loss benefits for the loss of industrial use of a hand. As will become clear, there appears to be a remarkable consistency in the decisions.

The first of the decisions is *Lovalo v Michigan Stamping Co,* 202 Mich 85; 167 NW 904 (1918). In *Lovalo,* plaintiff filed a claim for specific-loss benefits for the loss of a hand as the result of a press accident which amputated four fingers and part of the palm. The thumb remained intact, however.

This Court, in commenting on plaintiff's injury, made a forceful statement regarding the anatomical function of the hand:

"In common terms the human hand consists of the palm, fingers and thumb, being in combination peculiarly adapted physiologically to the function of prehension, or grasping, *which is their primary service,* locomotion and support being of scant importance as contradistinguished from the lower order of animals. In that sense and for such uses plaintiff has lost his right hand." *Lovalo,* 89.

The *Lovalo* Court affirmed the award of benefits made by the Industrial Accident Board, one of the predecessors of the WCAB. The Court rejected amputation *in toto* as the only standard for the determination of benefits. Quoting favorably the decision of the Industrial Accident Board, this Court set the following as the standard:

" 'As stated above, he may not technically have lost the entire hand within the meaning of section 10, of part 2, of the workmen's compensation act, but the board found from the testimony and a careful inspection and examination of the hand, that *he has lost substantially the entire usefulness of the hand.* The board cannot see that the thumb he has left is of much, if any, practical use to him as far as following any employment is concerned, and believes that *for all practical purposes he has lost the entire hand.'* " *Lovalo,* 88.

In *West v Postum Co, Inc,* 260 Mich 545; 245 NW 561 (1932), plaintiff filed for benefits after suffering the amputation of four fingers on his right hand. Plaintiff also suffered ankylosis of the right thumb and claimed that for all practical purposes his right hand was useless. In sustaining an award of benefits, this Court succinctly stated:

"A question is whether there has been loss of the hand under the act. The commission relies on *Lovalo v Michigan Stamping Co,* 202 Mich 85. In that case there was greater loss of the member in respect of the palm, but here there is a total loss of use. The holding in that case sustains decision here." *West,* 546-547.

*Lovalo* and *West* were faithfully followed in later decisions of this Court. See, *e.g., Rench v Kalamazoo Stove & Furnace Co,* 286 Mich 314; 282 NW

162 (1938); *Rupp v Hutter Construction Co,* 288 Mich 105; 284 NW 662 (1939).

After following the twofold standard of *Lovalo,* and later *West,* for almost 30 years, this Court abruptly switched its focus in *Hlady v Wolverine Bolt Co,* 325 Mich 23; 37 NW2d 576 (1949). In *Hlady,* plaintiff claimed benefits as the result of the amputation of four fingers in an accident. In reversing an award by the Workmen's Compensation Commission, this Court, based upon a limited record, applied a rather mechanical standard to the determination of specific-loss benefits. The Court cited *Lovalo* but distinguished that case. The Court stated:

> "As a matter of law the commission's award to plaintiff for the loss of a hand was erroneous, because there was no testimony that plaintiff's injury was other than the loss of 4 fingers of her right hand which resulted in no more than the normal impairment of industrial use which must always follow such amputations, or at least naturally and commonly results." *Hlady,* 26.

While focusing exclusively on anatomical loss, the *Hlady* Court ignored this Court's prior holdings that loss of industrial use need not be shown by anatomical loss alone but could also be shown by substantial loss of use in industry based upon a loss of the "primary service" of the hand. *Lovalo, supra,* 89.

In the series of decisions following *Lovalo, Hlady* represented an aberration. Further, *Hlady* was not rigidly followed. In *Lentz v Mumy Well Service,* 340 Mich 1; 64 NW2d 673 (1954), this Court upheld an award of specific-loss benefits in a case which was only superficially distinguishable from the facts of the *Hlady* case. The *Lentz* plaintiff had suffered the amputation of four fingers but had

also suffered some minor impairment of the thumb and some swelling of the hand when used. *Lentz* represented an unspoken return to the prior standard, focusing on both anatomical loss and loss of use.

*Hlady* was specifically and emphatically overruled by this Court in *Mitchell v Metal Assemblies, Inc,* 379 Mich 368; 151 NW2d 818 (1967). The *Mitchell* plaintiff had had all four fingers amputated in an industrial accident. As quoted by this Court in *Mitchell,* the WCAB affirmed an award of benefits made by the referee, saying:

" 'In the instant case all four fingers which were opposed to the thumb have been amputated. Since the capacity to grasp comes from the fact that the phalanges are opposable, it follows then that the capacity to grasp is destroyed. It is true that plaintiff can hold some objects by using the thumb in conjunction with the palm or surface of the hand. However, this is more in the nature of a holding action similar to that which might be accomplished by sticking an object between the phalanges of the paw of the performing dog. Plaintiff herein is left with little, if any, more than a pushing instrument. His capacity to use the forelimb to any degree depends upon the other parts of the forelimb. While the forelimb is not completely useless, it is of less use than a forelimb fitted with a modern prosthetic hand. Plaintiff is relegated to the ranks of the odd lot who must substitute other bodily functions for that destroyed in order to continue to be gainfully employed. We hold that he has suffered industrial loss of use of his hand. The order of the referee shall stand affirmed.' " *Mitchell,* 370-371.

The Court of Appeals reversed, specifically relying on *Hlady.*

In a unanimous opinion, this Court reversed the *Mitchell* decision of the Court of Appeals and in the process overruled *Hlady.* Noting the series of

specific-loss benefit cases beginning with *Lovalo,* the Court commented:

> " 'Michigan was once on the right track', the 'right track' being regular application by this Court of its original rule that no amputation *in toto* is required to entitle the appeal board * * * to find as a fact that the amputee had lost the industrial use of a substantially amputated member." *Mitchell,* 376.

Focusing its attention on the *Hlady* case itself, the *Mitchell* Court opined:

> "The trouble with *Hlady* is that it stands by itself in the midst of earlier and subsequent decisions which adhere to the more flexible, and manifestly more desirable, rule that a claim of industrial loss of use of a hand or other member is not (excepting where specifically applicable statutory language says otherwise) to be judicially determined contrary to supported factual findings of the appeal board. *Proof of outright loss of a hand is one thing. Proof of loss of the industrial use of that hand is something else. Proof of either entitles the appeal board to award compensation for loss of industrial use of the hand." Mitchell,* 378.

In rejecting the *Hlady* rationale, the *Mitchell* Court described *what is meant by loss of the industrial use of a hand.* It quoted with approval the commission's application of the *Lovalo* test in *Hlady:*

> " 'Applying the test described in the above case *[Lovalo]* it is self-evident that *the plaintiff has lost the primary service of her right hand.* The plaintiff has no useful grasping function in her right hand and it is obvious from a look at the photographs that no one would undertake to employ her at anything but a one-handed job. We, therefore, find that the plaintiff has lost the industrial use of her right hand as the result of her amputations * * *. The fact that the amputations

do not involve any portion of the hand beyond the 4 fingers does not warrant an opposite conclusion.'" *Mitchell,* 379.

Thus, the Court dispatched *Hlady* as a mere aberration and reinstated the long-held test announced in *Lovalo* for determining eligibility for specific-loss benefits.

A scant 11 months after reaching its decision in *Mitchell,* this Court announced its decision in *Hutsko v Chrysler Corp,* 381 Mich 99; 158 NW2d 874 (1968). The factual setting of the *Hutsko* case was as follows: plaintiff was a skilled tradesman who caught his hand in a fan he was repairing. As a result of the accident, plaintiff's little finger was amputated; there was restricted use of the ring and middle fingers; and the index finger was deformed. Plaintiff possessed a normal thumb and palm. Subsequent to filing a claim for specific-loss benefits for the loss of his hand, plaintiff retired. All the medical testimony introduced agreed that plaintiff had lost the industrial use of his hand in his skilled trade but retained some general industrial use.

This Court granted leave to appeal on the following very narrow question:

"Where a claimant has lost the industrial use of his hand in his particular skill but retains a measure of general unskilled industrial use thereof, has he sustained the loss of the hand within the meaning of the specific loss schedule of the workmen's compensation law?" *Hutsko,* 101.

In determining that the standard for specific-loss benefits was the ability to perform general unskilled industrial work rather than the ability to perform a particular skilled trade, the Court an-

swered more than it was asked to answer. In dictum, the Court stated:

"However, in order to qualify for the specific loss payment where there has not been the actual physical loss of the member as by amputation, there must be that total incapacitating loss of use which renders the organ or member industrially useless for any type of work, skilled or unskilled. To hold otherwise we think would be a logical contradiction. Plaintiff's injury has not amounted to the actual physical loss tantamount to destruction or amputation contemplated by the specific loss schedule. The test is not the degree of loss measured by the requirements of the skill of the injured workman. The test is the degree of loss as compared with the actual physical loss by destruction or amputation. We hardly need add that where the specific loss schedule makes an exception as in the case of an eye, the percentage of loss legislatively specified obtains." *Hutsko,* 102-103.

The holding of *Hutsko* may be reconciled with the holdings in *Lovalo, West, Rench, Lentz* and *Mitchell.* All medical testimony agreed that Hutsko retained some general industrial use of his hand. Given these facts, it was concluded, in effect, that the plaintiff had not lost the "primary service" of his hand. Thus, he had not suffered a substantial loss of utility in industry as defined in *Mitchell.*

However, language employed in the Court's opinion created confusion for the WCAB and the Court of Appeals in cases that would follow *Hutsko.* It became apparent that specific-loss benefits for the loss of a hand were being denied because there was no showing of complete amputation or its equivalent.

Illustrative of the logic employed is the statement of the Court of Appeals in the present con-

troversy before this Court. The Court of Appeals stated:

"In view of these findings the WCAB could not have applied the *Hutsko* standard, as it is properly interpreted, because it is clear that plaintiff retained some functions of the hand that would not have been present had the hand actually been amputated." *Pipe v Leese Tool & Die Co,* 90 Mich App 741, 746; 282 NW2d 642 (1979).

The assumption was made that *Hutsko* had *sub silentio* overruled *Mitchell* and all the predecessors of *Mitchell. Lewis v Detroit,* 58 Mich App 570; 228 NW2d 467 (1975). However, to the extent that *Hutsko* has been read to require that to recover specific-loss benefits one must show a physical loss tantamount to amputation, whether the basis for recovery is anatomical loss or loss of industrial use of the hand, such interpretation is incorrect.

With this in mind, it must be noted that at least one Court of Appeals panel and the WCAB in other decisions cogently refused to apply the *Hutsko* decision as it has been misinterpreted in its most literal meaning. *Chaffin v Grand Rapids Metalcraft,* 38 Mich App 200; 196 NW2d 20 (1972), *lv den* 387 Mich 776 (1972). Furthermore, in concurring in the present case, WCAB member Marshall stated:

"It is certain that loss of industrial use can never be found as a matter of law under *Hutsko, supra,* where there remains some movable flesh and bone. However, in cases such as this we are concerned with loss of industrial use for reasonable and practical industrial purposes and not exclusively with anatomical loss, although it is obvious that the extent of anatomical loss will always be one of the primary factual considerations. * * * [P]reoccupied enchantment with the legal

stringencies of *Hutsko, supra,* are misplaced. The emphasis of decisional inquiry here is more properly with the reasonable and practical issues of fact as to loss of industrial use mandated by *Mitchell, supra.* Plaintiff is entitled to specific loss compensation for the *factual* loss of industrial use of his right hand." 1977 WCABO 3376, 3387.


## II

The fact that *Hutsko* may have been subject to misinterpretation does not require that we establish a new test for determining qualification for specific-loss benefits for the loss of a hand. The standard which evolved from *Lovalo* and *West* and was recently re-invoked and clearly enunciated in *Mitchell* provides both a realistic and practical test for determining eligibility for specific-loss benefits. This standard is: *For purposes of determining an award of specific-loss benefits for the loss of a hand, there must be a showing of either anatomical loss or loss of the industrial use of the hand as determined by the loss of the primary service of the hand in industry.* We are satisfied that this test is comparable to the test that is most universally applied in the other jurisdictions of this country. See, *e.g., Travelers Ins Co v Seabolt,* 361 SW2d 204 (Tex, 1962); *Mustapha v Patton-Mac-Guyer Co,* 100 RI 493; 217 A2d 240 (1966); *Boxleitner v St Maries Plywood Co,* 91 Idaho 852; 433 P2d 122 (1967); *Federal Copper & Aluminum Co v Wright,* 504 SW2d 957 (Tenn, 1974); *Gindy Manufacturing Co v Workmen's Compensation Appeal Board,* 32 Pa Commonwealth Ct 128; 378 A2d 492 (1977).

In this case, the Workers' Compensation Appeal Board found that plaintiff suffered a loss of the

industrial use of the hand. It is clear "that, in this particular type of closely disputed 'loss of industrial use' case, the issue almost automatically becomes one of fact". *Mitchell, supra,* 375.

Applying this standard to the facts of the present case, there is no question that plaintiff, Frederick J. Pipe, meets the test. By the direct testimony of Doctor Van't Hof, plaintiff has suffered an 86 percent anatomical loss to his right hand. The WCAB found that the hand has no significant power grasp, some precision grasp, no significant pinch function and some hook and push function. Additionally, by plaintiff's own testimony, plaintiff is able to make little or no use of his right hand in the industrial setting in which he works. In effect, although retaining some function, he has lost the *primary service* of his hand. For all practical purposes "he has lost substantially the entire usefulness of the hand". *Lovalo, supra,* 88. As plaintiff has substantially lost the use of his hand in industry, he is qualified for specific-loss benefits.

The Court of Appeals is reversed. Costs to plaintiff.

KAVANAGH, WILLIAMS, LEVIN, and FITZGERALD, JJ., concurred with BLAIR MOODY, JR., J.

COLEMAN, C.J. *(concurring).* We concur in the result reached.

This separate concurrence is to express disagreement with the legal standard stated in the majority's opinion. We conclude that the proper legal standard for entitlement to specific-loss benefits for the loss of a hand is whether the employee has suffered (1) an anatomical loss equivalent to an amputation or (2) the loss of the industrial use of the hand.

We agree with the majority's analysis of *Hutsko*

*v Chrysler Corp,* 381 Mich 99; 158 NW2d 874 (1968), and their conclusion that it did not adopt a standard more restrictive than the standard applied in *Mitchell v Metal Assemblies, Inc,* 379 Mich 368; 151 NW2d 818 (1967). The standard consistently applied by this Court is whether the employee has lost the industrial use of the hand.

We cannot agree with the majority that the standard consistently applied by this Court is whether the employee has lost the primary service of the hand in industry. Although some statements have been made in opinions concerning a loss of primary functions, such statements were dicta rather than the legal standard used to resolve the case.

In *Lovalo v Michigan Stamping Co,* 202 Mich 85; 167 NW 904 (1918), this Court did make a reference to the primary services performed by the hand. However, the holding in *Lovalo* did not incorporate these statements into the standard controlling entitlement to specific-loss benefits. It could not have since Lovalo was never awarded specific-loss benefits for the loss of a hand. He received total disability wage-loss benefits.

The only other case referred to by the majority as adopting the loss of primary function test is *Mitchell, supra.* However, a perusal of the opinion in *Mitchell* clearly indicates that the Court was applying the loss of industrial use standard.

The majority's opinion in the instant case is the first to enunciate the standard for specific-loss benefits as a loss of the primary service of the hand in industry. If this is the same standard as has been applied by this Court (the majority's opinion concludes there is no present need for a different one), giving that standard a new name will only hinder the development of a clear rule of

law relating to this issue. The Workers' Compensation Appeal Board in the instant case did not find that plaintiff lost the primary service of his hand in industry. They found he lost the industrial use of the hand.

If the standard of a loss of primary service in industry is intended to be something other than a loss of industrial use, we cannot define the meaning of that standard. Furthermore, there is serious question whether the case law would support the adoption of any standard other than a loss of industrial use.

We conclude that the standard governing entitlement to specific-loss benefits for the loss of a hand is whether the employee suffered an anatomical loss equivalent to an amputation or the loss of the industrial use of the hand.

Applying this standard to the facts found by the WCAB, we conclude that the award of benefits was not subject to reversal.

RYAN, J., concurred with COLEMAN, C.J.