**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED MAY 3, 2005**

SCOTT M. CAIN,

    Plaintiff-Appellee,

v

       No. 125111
       AFTER REMAND

WASTE MANAGEMENT, INC. AND TRANSPORTATION INSURANCE CO.,

    Defendants-Appellants,

and

SECOND INJURY FUND,

    Defendant-Appellee.

_____

SCOTT M. CAIN,

    Plaintiff-Appellee,

v

       No. 125180
       AFTER REMAND

WASTE MANAGEMENT, INC. AND TRANSPORTATION INSURANCE CO.,

    Defendants-Appellees,

and

SECOND INJURY FUND,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

TAYLOR C.J.

At issue in this worker's compensation case is whether a worker must suffer an actual amputation of a limb or body part in order to qualify for either specific loss benefits (also described as scheduled loss benefits) or total and permanent disability benefits. We hold that specific loss benefits under MCL 418.361(2) do not require an amputation. It is sufficient to qualify for such benefits if the limb or body part has lost its usefulness. Regarding total and permanent disability benefits under MCL 418.361(3)(b), which covers the loss of both legs, as with specific loss, if the legs have lost their usefulness, even though not amputated, the worker qualifies for total and permanent disability benefits. We therefore affirm the decisions of the Court of Appeals and the Worker's Compensation Appellate Commission (WCAC).

## BACKGROUND

This case was previously before us in *Cain v Waste Mgt, Inc*, 465 Mich 509, 513; 638 NW2d 98 (2002) (*Cain I*), where we summarized the facts describing plaintiff's injuries as follows:

> Plaintiff Scott M. Cain worked as a truck driver and trash collector for defendant, Waste Management, Inc. In October 1988, as he was

standing behind his vehicle emptying a rubbish container, he was struck by an automobile that crashed into the back of the truck. Mr. Cain's legs were crushed. Physicians amputated Mr. Cain's right leg above the knee. His left leg was saved with extensive surgery and bracing.

In February 1990, Mr. Cain was fitted with a right leg prosthesis, and he was able to begin walking. He returned to his employment at Waste Management and started performing clerical duties.

Mr. Cain's left leg continued to deteriorate. In October 1990, he suffered a distal tibia fracture. Doctors diagnosed it as a stress fracture caused by preexisting weakness from the injury sustained in the accident. After extensive physical therapy and further surgery on his left knee, Mr. Cain was able to return to Waste Management in August 1991, first working as a dispatcher and then in the sales department.

Waste Management voluntarily paid Mr. Cain 215 weeks of worker's compensation benefits for the specific loss of his right leg. MCL 418.361(2)(k). However, there was disagreement concerning whether he was entitled to additional benefits.

To understand the benefits that are at issue, it is necessary to review several sections of the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq*. Specific loss benefits are payable under MCL 418.361(2)(k) to an employee "for the loss of" a leg.[1]  Total and

---

[1] The full text of MCL 418.361(2) reads:

In cases included in the following schedule, the disability in each case shall be considered to continue for the period specified, and the compensation paid for the personal injury shall be 80% of the after-tax average weekly wage
(continued…)

3

subject to the maximum and minimum rates of compensation under this act for the loss of the following:

(a) Thumb, 65 weeks.

(b) First finger, 38 weeks.

(c) Second finger, 33 weeks.

(d) Third finger, 22 weeks.

(e) Fourth finger, 16 weeks.

The loss of the first phalange of the thumb, or of any finger, shall be considered to be equal to the loss of ½ of that thumb or finger, and compensation shall be ½ of the amount above specified.

The loss of more than 1 phalange shall be considered as the loss of the entire finger or thumb. The amount received for more than 1 finger shall not exceed the amount provided in this schedule for the loss of a hand.

(f) Great toe, 33 weeks.

(g) A toe other than the great toe, 11 weeks.

The loss of the first phalange of any toe shall be considered to be equal to the loss of ½ of that toe, and compensation shall be ½ of the amount above specified.

The loss of more than 1 phalange shall be considered as the loss of the entire toe.

(h) Hand, 215 weeks.

(i) Arm, 269 weeks.

An amputation between the elbow and wrist that is 6 or more inches below the elbow shall be considered a hand, and an amputation above that point shall be considered an arm.

(continued…)

permanent disability benefits are payable "[w]hile the incapacity for work resulting from a personal injury is total," MCL 418.351(1), and MCL 418.361(3) defines what "total and permanent disability" means.[2]   Of particular

---

(…continued)

      (j) Foot, 162 weeks.

      (k) Leg, 215 weeks.

An amputation between the knee and foot 7 or more inches below the tibial table (plateau) shall be considered a foot, and an amputation above that point shall be considered a leg.

      (l) Eye, 162 weeks.

Eighty percent loss of vision of 1 eye shall constitute the total loss of that eye.

[2] The subsection reads in full:

Total and permanent disability, compensation for which is provided in section 351 means:

      (a) Total and permanent loss of sight of both eyes.

      (b) Loss of both legs or both feet at or above the ankle.

      (c) Loss of both arms or both hands at or above the wrist.

      (d) Loss of any 2 of the members or faculties in subdivisions (a), (b), or (c).

      (e) Permanent and complete paralysis of both legs or both arms or of 1 leg and 1 arm.

      (f) Incurable insanity or imbecility.

      (g) Permanent and total loss of industrial use of both legs or both hands or both arms or 1 leg and 1 arm; for the purpose of this

(continued…)

relevance here are two of the definitions of total and permanent disability found in MCL 418.361(3)(b), "Loss of both legs or both feet at or above the ankle," and MCL 418.361(3)(g), "Permanent and total loss of industrial use of both legs or both hands or both arms or 1 leg and 1 arm . . . ."

In *Cain I*, we determined that because Mr. Cain had a brace on his left leg that enabled him to return to work, he had not lost industrial use of both legs, as required by MCL 418.361(3)(g).[3] We noted there is a difference between specific loss and loss of industrial use, and we "adopt[ed] as our own" the analysis of the WCAC in its April 1997 opinion. *Cain I, supra* at 521. In accord with that analysis, we held that the "corrected" standard applies to claims for permanent and total loss of industrial use under MCL 418.361(3)(g), and we remanded to the WCAC "to consider plaintiff's specific loss claim." *Cain I, supra* at 524. On remand, the WCAC determined actual amputation is unnecessary to qualify for specific loss benefits and,

---

(…continued)
      subdivision such permanency shall be determined not less than 30 days before the expiration of 500 weeks from the date of injury.

[3] The reader is directed to *Cain I* for a full discussion of the procedural history of the case to that
(continued…)

6

because plaintiff's leg is essentially useless, his injury "equated with anatomical loss." The WCAC cited as authority *Hutsko v Chrysler Corp*, 381 Mich 99; 158 NW2d 874 (1968), and *Tew v Hillsdale Tool & Mfg Co*, 142 Mich App 29; 369 NW2d 254 (1985). Both are cases in which specific loss claims were allowed where there had been a loss of use, but not an anatomical loss. The WCAC then concluded without further explanation that "[h]aving shown specific loss of each leg, plaintiff is entitled to total and permanent disability benefits." On appeal, the Court of Appeals majority, citing *Pipe v Leese Tool & Die Co*, 410 Mich 510; 302 NW2d 526 (1981), affirmed the decision of the WCAC. 259 Mich App 350; 674 NW2d 383 (2003). It concluded that each of plaintiff's legs qualified for specific loss benefits (one through amputation and one through lost industrial use), and that these losses, when considered together, equaled a "loss of both legs" under MCL 418.361(3)(b), thus entitling plaintiff to total and permanent disability benefits.

Both the defendant employer and the Second Injury Fund sought leave to appeal. We granted both applications for leave, ordering the appeals to be argued and submitted

---

(…continued)
point, including details of the opinions of the magistrate, the WCAC, and the Court of Appeals.

together. 470 Mich 870 (2004). We directed the parties in both appeals to include among the issues to be briefed whether the "loss of industrial use" standard may be applied to claims of specific loss under MCL 418.361(2) and whether *Pipe, supra,* should be overruled. We further directed the parties in Docket No. 125180 to address the issues whether the WCAC exceeded the scope of this Court's remand order by awarding plaintiff total and permanent disability benefits and whether total and permanent disability benefits under MCL 418.361(3)(b)(loss of both legs) may be awarded on the basis of plaintiff's specific (anatomical) loss of one leg and his specific (industrial use) loss of the other leg.

### STANDARD OF REVIEW

We review de novo questions of law in worker's compensation cases. *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 697 n 3; 614 NW2d 607 (2000). Entitlement to worker's compensation benefits must be determined by reference to the statutory language creating those benefits. *Nulf v Browne-Morse Co*, 402 Mich 309, 312; 262 NW2d 664 (1978). As we have noted in the past, when we construe a statute, our primary goal is to give effect to the intent of the Legislature and our first step in that process is to review the language of the statute itself. *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d

164 (1999). The Legislature has specified the proper approach to construing statutory language, saying in MCL 8.3a:

> All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.[4]

### ANALYSIS: SPECIFIC LOSS

We turn first to the question of specific loss and therefore focus our analysis on MCL 418.361(2). The loss provision of this section repeatedly has been held to be intended to compensate workers who have suffered one of the losses enumerated in this provision, regardless of the effect on the worker's earning capacity.[5] *Cain I, supra* at 524; *Redfern v Sparks-Withington Co*, 403 Mich 63, 80-81; 268 NW2d 28 (1978). This means if a worker, for example, loses an arm, thumb, finger, leg, or so on in a workplace

---

[4] However, when a statute specifically defines a given term, that definition alone controls. *WS Butterfield Theatres, Inc v Dep't of Revenue*, 353 Mich 345; 91 NW2d 269 (1958).

[5] We note that MCL 418.354(16), in providing for coordination of social security and other benefits, recognizes this principle, stating in part, "It is the intent of the legislature that, because benefits under section 361(2) and (3) are benefits which recognize human factors substantially in addition to the wage loss concept, coordination of benefits should not apply to such benefits."

injury, specific loss benefits, as set forth in the schedule, will be awarded even if no time is missed from work. At issue here is whether a limb (here, a leg), crushed but not severed, is to be treated as lost, thus entitling the injured worker to specific loss benefits.

Defendants argue that the word "loss" unambiguously means "amputation," especially in the context of § 361(2)(k), which expressly mentions amputation. As they argue it, amputation is required because MCL 418.361(2)(k) provides benefits for the loss of a leg by stating:

> Leg, 215 weeks.
>
> An amputation between the knee and foot 7 or more inches below the tibial table (plateau) shall be considered a foot, and an amputation above that point shall be considered a leg.

Thus, defendants assert that the amputation language, at least regarding legs, limits the word "loss" in the statute to mean that only amputations are compensable.

Plaintiff, on the other hand, while agreeing that the statute is unambiguous, argues that defendants' approach is flawed because it disregards the original meaning of the specific loss provisions when the WDCA was enacted almost a century ago in favor of a modern perception of the word's meaning. The original meaning, plaintiff asserts, is controlling because, although the statute has been amended many times since its enactment in 1912, the word "loss" has

10

remained unchanged and without express qualifications or limitations. Plaintiff analogizes our task in determining the meaning of "loss" to that which we undertook in *Title Office, Inc v Van Buren Co Treasurer,* 469 Mich 516, 522; 676 NW2d 207 (2004), where we determined what the plain and ordinary meaning of "transcript" was in 1895. This analytical approach of plaintiff is sound. Because the statute itself does not define "loss," we agree with plaintiff that we must ascertain the original meaning the word "loss" had when the statute was enacted in 1912.

"When determining the common, ordinary meaning of a word or phrase, consulting a dictionary is appropriate." *Title Office, Inc, supra* at 522. In the dictionaries from the era of the original legislation, the definition of "loss" is fairly broad: "Perdition, ruin, destruction; the condition or fact of being 'lost,' destroyed, or ruined," *New English Dictionary* (1908); "State or fact of being lost or destroyed; ruin; destruction; perdition; as *Loss* of a vessel at sea," *Webster's New Int'l Dictionary of the English Language* (1921); "Failure to hold, keep, or preserve what one has had in his possession; disappearance from possession, use, or knowledge; deprivation of that which one has had: as, the *loss* of money by gaming, *loss* of health or reputation, *loss* of children: opposed to *gain,*" *Century Dictionary and Cylopedia* (1911). From this we can

see that severance is but one way a loss may occur; loss also occurs when something is destroyed, ruined, or when it disappears from use.  We conclude that amputation is not required in order for a person to have suffered the loss of a specified body part.

Having ascertained the commonly understood meaning of the word "loss," our substantive analysis of its definition is complete.  *Gladych v New Family Homes, Inc*, 468 Mich 594, 597; 664 NW2d 705 (2003).  Our conclusion is reinforced by the fact that the same meaning for the word "loss" is found in the cases construing late nineteenth-century private liability insurance plans for the aid of injured workers that were, in part, the models for the body-part loss provisions of our first worker's compensation act.  When, in special session, the Legislature in 1912 passed that first act, known as Michigan's "Workmen's Compensation Act,"[6] it was the culmination of the efforts of the five-person Employers' Liability and Workmen's Compensation Commission appointed by Governor Chase S. Osborn in 1911.[7] The commission had been formed because of what was described at the time as

---

[6] 1912 (1st Ex Sess) PA 10.

[7] 1911 PA 245.

12

"wide dissatisfaction" with the employer's liability at common law for injuries suffered by his employees. Report of the Employers' Liability and Workmen's Compensation Commission of the State of Michigan, 5 (1911) (Report). The commission was directed to "investigate and report a plan for legislative action to provide compensation for accidental injuries or death arising out of and in the course of employment . . . ." *Id*. In its report, the commission, after concluding that the existing negligence-based system (1) failed to sufficiently encourage prevention of accidents, (2) did not protect employers against excessive verdicts, (3) resulted in inadequate compensation for injured workers, and (4) engendered animosity and strife, recommended a statute based on similar provisions already enacted in Massachusetts, Wisconsin, and New Jersey.[8] The Legislature, with very few

---

[8] These in turn were modeled after European laws that first appeared in the mid-1800s and that were well established by the end of that century, swept along by massive industrialization occurring at the same time throughout Europe. Harger, *Worker's compensation, a brief history*, <www.fldfs.com/WC/history.html> (accessed December 22, 2004). In this country, the first constitutional worker's compensation law was the 1908 Employer's Liability Acts, 45 USC 51-60. In 1911, the first states followed, and by 1913, twenty-three states had comparable laws. Harger, *supra*. By 1948, all the states had at least some form of worker's compensation, including the territories of Alaska and Hawaii. Harger, *supra*.

13

changes to the recommended language, briskly enacted this proposal as Michigan's workmen's compensation act less than three weeks after the bill was introduced. 1912 (1st Ex Sess) Journal of the House 13, 149-150.

In dealing with what today is described as total and permanent disability, the 1912 statute stated in § 9:

> While the incapacity for work resulting from the injury is total, the employer shall pay, or cause to be paid as hereinafter provided, to the injured employee a weekly compensation equal to one-half his average weekly wages, but not more than ten dollars nor less than four dollars a week; and in no case shall the period covered by such compensation be greater than five hundred weeks, nor shall the total amount of all compensation exceed four thousand dollars. [1912 (1st Ex Sess) PA 10, part II, § 9.]

In dealing with partial incapacity, the statute stated at § 10:

> While the incapacity for work resulting from the injury is partial, the employer shall pay, or cause to be paid as hereinafter provided, to the injured employee a weekly compensation equal to one-half the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter, but not more than ten dollars a week; and in no case shall the period covered by such compensation be greater than three hundred weeks from the date of the injury. In cases included by the following schedule the disability in each such case shall be deemed to continue for the period specified, and the compensation so paid for such injury shall be as specified therein, to wit:

* * *

14

> For the loss of a leg, fifty per centum of average weekly wages during one hundred and seventy-five weeks. [1912 (1st Ex Sess) PA 10, part II, § 10.]

Section 9 allowed wage-based benefits to be paid to workers who were totally incapacitated from work, regardless of the type of work-related injury that caused the incapacity, while § 10 provided for benefits when the worker was partially incapacitated. Moreover, the latter part of § 10, with its schedule of benefits for specific losses, allowed a set amount of weeks that benefits would be awarded when a worker suffered one of the specific injuries described. In doing so, it was intentionally patterned after the specific loss provisions of the above-referenced employers' private liability insurance plans, which were designed to provide benefits to workers injured on the job. Report, *supra*.[9]

---

[9] The commission's report even included in its appendix the text of two plans "typical" at the time. Report, *supra*, Appendix VII, 143-146. The "Benefit and Relief Plans of the Cleveland-Cliffs Iron Company" provided:

> In addition to the monthly benefit payments, other amounts are paid for certain serious injuries, as follows:

> Loss of one arm, leg or eye, $166.66.

> Loss of both arms, legs or eyes, $500.

Similarly, the "Benefit and Relief Plans of the Oliver Iron Mining Company" provided:

(continued…)

15

The cases construing such insurance policies in that era, from Michigan and elsewhere, unmistakably indicate that the word "loss," just as it did in dictionaries of the time, meant not just severance or amputation but also the destruction of the usefulness of the member.  In Michigan, our Court in *Fuller v Locomotive Engineers' Mut Life & Accident Ins Ass'n*, 122 Mich 548, 553; 81 NW 326 (1899), construing the specific loss provision in an insurance policy, said just this, indicating that

> where an insurance policy insures against the loss of a member, or the loss of an entire member, the word "loss" should be construed to mean the destruction of the usefulness of the member, or the entire member, for the purposes to which, in its normal condition, it was susceptible of application.

_____

(…continued)

The following injuries have specified amounts, and others in proportion to these injuries:

(a) For the loss of a hand, twelve months' wages.

(b) For the loss of an arm, eighteen months' wages.

(c) For the loss of a foot, nine months' wages.

(d) For the loss of a leg, twelve months' wages.

(e) For the loss of one eye, six months' wages.

Sections 9 and 10 of the 1912 act incorporated language similar to these insurance plans.

Simply stated, under such a policy in Michigan, no amputation was necessary for a loss. The rationale for not limiting loss just to amputation was the understanding by this Court and, as we will explain, by other American courts that the term "loss" in such policies should be given its ordinary and popular meaning, which was broad enough to include loss of usefulness.

As the Missouri Supreme Court said on this topic, the word "loss" in insurance policies "was used in its ordinary and popular sense and [did] not mean that there should be a total destruction of the [member], anatomically speaking, but that the loss of the use of it for the purposes to which [the member] is adapted would be a loss of it . . . ." *Sisson v Supreme Court of Honor*, 104 Mo App 54, 60; 78 SW 297 (1904). The Kansas Supreme Court stated it similarly: "The loss of a member of the body, as used in an accident insurance policy, unless restricted or modified by other language, carries the common meaning of the term 'loss,' which is the loss of the beneficial use of the member. Obviously this may occur when there is not a complete severance of the member from the body." *Noel v Continental Cas Co*, 138 Kan 136, 139; 23 P2d 610 (1933). The Kansas court then reinforced its holding by citing thirteen cases from ten other states from the late

17

nineteenth and early twentieth centuries, holding to the same effect.[10]

Also buttressing our analysis is that, in the early years of the act's existence, the decisions of the Industrial Accident Board (IAB), the WCAC's predecessor, also construed "loss" as defined in the dictionary. That is consistent with its commonly understood meaning. This is consequential because half of the four IAB board members had served on Governor Osborn's commission and had recommended the very "loss" language we are considering.[11] We find the interpretation these board members gave to the statute useful in the same way that the comments of

---

[10] *Travelers' Ins Co v Richmond*, 284 SW 698 (Tex Civ App, 1926); *Continental Cas Co v Linn*, 226 Ky 328; 10 SW2d 1079 (1928); *Jones v Continental Cas Co*, 189 Iowa 678; 179 NW 203 (1920); *Locomotive Engineers' Mut Life & Accident Ins Co v Meeks*, 157 Miss 97; 127 So 699 (1930); *Moore v Aetna Life Ins Co*, 75 Or 47; 146 P 151 (1915); *Bowling v Life Ins Co of Virginia*, 39 Ohio App 491; 177 NE 531 (1930); *Citizens' Mut Life Ass'n v Kennedy*, 57 SW2d 265 (Tex Civ App, 1933); *Sneck v Travelers' Ins Co*, 88 Hun 94; 34 NYS 545 (1895); *Sheanon v Pacific Mut Life Ins Co*, 77 Wis 618; 46 NW 799 (1890); *Lord v American Mut Accident Ass'n*, 89 Wis 19; 61 NW 293 (1894); *Berset v New York Life Ins Co*, 175 Minn 210; 220 NW 561 (1928); *Sisson v Supreme Court of Honor*, 104 Mo App 54; 78 SW 297 (1904); *Int'l Travelers' Ass'n v Rogers*, 163 SW 421 (Tex Civ App, 1914).

[11] Richard L. Drake was its first secretary and Ora E. Reaves was one of three board commissioners. Reaves remained on the board until at least 1920. Michigan Official Directory and Legislative Manual, 1913-1914, 1915-1916, 1917-1918, and 1919-1920.

drafting committees can be "useful interpretive aids" for construing statutes. See *Gladych, supra* at 601 n 4. The IAB, in *Lardie v Grand Rapids Show Case Co*, 1916 Workmen's Compensation Cases 17, 19, in discussing loss, stated that "courts have uniformly construed provisions of accident policies insuring against the loss of a member, to cover cases where the usefulness of the member was destroyed by accident without resulting in severance or amputation." *Id.*, citing *Fuller, supra* at 553. Similarly, that "loss" in the context of worker's compensation specific loss benefits did not mean only amputations, but also included loss of usefulness, was indicated by the IAB's decisions in an unnamed case cited in Industrial Accident Bd, Bulletin No 3, 13 (1913);[12] *Rider v C H Little Co*, Industrial

---

[12] The board stated in that case:

> The action of the surgeon in amputating a finger, or in failing to amputate it, or in choosing the point of amputation is not controlling in all cases of this kind. Each case depends for its decision upon the particular facts relating to the finger, and these might relate to the point of amputation, or the fact that the finger or a portion thereof had been rendered useless without being amputated. . . . The Board is further of the opinion that in case no part of the finger is amputated and the injury is such as to entirely destroy the usefulness of the first phalange or the entire finger, in that event the injured person has lost the first phalange or the finger, as the case may be, as completely as if the same had been amputated.

19

Accident Bd, *supra* at 27, 29 (1913); *Hirschkorn v Fiege Desk Co*, 184 Mich 239; 150 NW 851 (1915); *Purdy v Sault Ste Marie*, 188 Mich 573, 579; 155 NW 597 (1915); *Cline v Studebaker Corp*, 189 Mich 514; 155 NW 519 (1915); *Lardie, supra; Carpenter v Detroit Forging Co*, 191 Mich 45; 157 NW 374 (1916); *Packer v Olds Motor Works*, 195 Mich 497; 162 NW 80 (1917); *Adomites v Royal Furniture Co*, 196 Mich 498; 162 NW 965 (1917).

The same can be seen in large part in this Court's jurisprudence of the time. For example, in *Purdy, supra* at 579, the Court affirmed the IAB's specific loss award for a crushed leg.[13] In *Lovalo v Michigan Stamping Co*, 202 Mich 85, 89; 167 NW 904 (1918), the Court held that the claimant had suffered the loss of his hand where four fingers and nearly all the palm were amputated, saying that "the loss of all the palm and all of the fingers of the hand could . . . be reasonably considered the loss of the entire hand." Indeed, the only expressly contrary case in this era is *Wilcox v Clarage Foundry & Mfg Co*, 199 Mich 79; 165 NW 925 (1917), where the Court, in a case with difficult facts, determined that the specific loss provision required anatomical loss. The *Wilcox* Court made no effort to

---

[13] The IAB's decision is at 1916 Workmen's Compensation Cases 65.

20

reconcile its holding with the IAB's clearly stated understanding of "loss," nor with *Fuller* or *Purdy*, but analogized instead to cases where the plaintiffs had suffered partial losses and this Court had required proof of *complete*, rather than *partial*, loss.[14]  We conclude that, given its outlier status, as well as the fact that the construction it seeks to give to the term "loss" is inconsistent with the original meaning of "loss" in the act, *Wilcox* was incorrectly decided.  Thus, we overrule *Wilcox* so that its potentially confusing shadow will be removed from our case law.[15]

To summarize, then, regarding this issue of the definition of "loss": the definition comes from its commonly understood meaning at the time of enactment.  The contemporaneous uses of the word are corroborative and reinforcing of this definition.

---

[14] Even if those cases can be read as requiring amputation, *Wilcox* was flawed in a broader sense by the fact that, rather than tracing its rationale to the act itself, it used as a template, as one might in a common-law case, the prior cases construing the act.

[15] We are reinforced in our notion that *Wilcox* is aberrant by the fact that the *Lovalo* Court, in reaching a holding contrary to *Wilcox* just one year later, left unaddressed the continuing strength of *Wilcox*, suggesting that the Court considered it confined to its facts.

21

Defendants assert that, even given this conclusion, the 1927 amendments forever altered the definition of "loss." In 1927, the Legislature, for the only time in the twentieth century, consequentially amended the specific loss section of the statute by adding to the provision regarding a leg the language: "An amputation between the knee and foot six or more inches below the knee shall be considered a foot, above this point a leg[.]"[16] 1927 PA 63. Keying off of this amendment, defendants urge that this language implicitly was designed to alter any previously broad understanding of the word "loss" so that after the amendment there could be no specific loss without an amputation. We think this explanation insufficiently appreciates that the amendment came in the wake of a series of cases where this Court had made debatable calls on the nature of the loss after an amputation.[17] That is, at what

_____

[16] Similarly, the amendment added to the provision for an arm, "An amputation between the elbow and wrist 6 or more inches below the elbow shall be considered a hand, above this point an arm."

[17] *Stocin v C R Wilson Body Co*, 205 Mich 1; 171 NW 352 (1919) (holding that a claimant had lost his arm, not just his hand, where it was severed below the elbow and the upper arm was atrophied), *Curtis v Hayes Wheel Co*, 211 Mich 260; 178 NW 675 (1920) (holding that the claimant had lost just a foot where his amputation occurred four to five inches below the knee), and *Reno v Holmes*, 238 Mich 572; 214 NW 174 (1927) (holding that a claimant had lost his
(continued…)

22

point on the limb had a loss become not just of a hand but of an arm, not just of a foot but of a leg? We believe the goal of the amendment was to bring certainty to this discrete set of determinations once there was an amputation. It is hard to conclude otherwise, given that the Legislature, in its amendment, did not expressly alter or redefine the word "loss" itself and especially given that word's quite clear meaning in the dictionaries of the time as well as the above-referenced decisions of the IAB and this Court. Moreover, this Court's leading postamendment decision in the 1930s on the issue of loss[18] is consistent with this understanding that the 1927 amendment was not intended to reverse the holdings of the IAB and this Court on what is a loss.

This dominant theme of our case law, that loss does not require amputation, can be seen throughout the mid-century, albeit with some false starts.[19] Later in the

---

(…continued)
leg, not just his foot, where it was severed 5½ inches below the knee).

[18] See *Rench v Kalamazoo Stove & Furnace Co*, 286 Mich 314; 282 NW 162 (1938), where the Court allowed an award for loss of two hands where most of the plaintiff's fingers had been severed and he had suffered a total loss of use of both his hands.

[19] In the middle of the century, with *Hlady v Wolverine Bolt Co*, 325 Mich 23; 37 NW2d 576 (1949), as well as *Utter*
(continued…)

century, in *Pipe v Leese Tool & Die Co*, 410 Mich 510; 302 NW2d 526 (1981), the Court correctly determined, consistent with the original understanding of the act and the earlier cases we have discussed, that amputation was not a prerequisite to a "loss."

*Pipe*, however, in a phrase used frequently in these cases, described this loss of usefulness as "loss of the industrial use . . . ." *Id*. at 527. The phrase "loss of industrial use" does not appear anywhere in the specific loss provisions, and seems to have been intended as judicial shorthand to describe the condition of the injured member from the standpoint of its use in employment. However, this description causes confusion because it does not adequately capture the proper standard, which is that specific loss is to be determined without reference to the plaintiff's earning capacity or ability to return to work. That is, it is paid if the loss has been incurred and it is not relevant whether the worker can work after the loss.

---

(…continued)
*v Ottawa Metal Co*, 326 Mich 450; 40 NW2d 218 (1949), and *Barnett v Kelsey-Hayes Wheel Co*, 328 Mich 37; 43 NW2d 55 (1950), this Court decided cases contrary to this original understanding of the specific loss provisions. But these cases are inconsistent with the proper understanding of the statute and we note that they were hesitatingly followed, if at all, and *Hlady was* expressly overruled. *Mitchell v Metal Assemblies, Inc*, 379 Mich 368, 380; 151 NW2d 818 (1967).

*Miller v Sullivan Milk Products, Inc*, 385 Mich 659; 189 NW2d 304 (1971); *Shumate v American Stamping Co*, 357 Mich 689; 99 NW2d 374 (1959). We believe it was this concept that the *Pipe* Court was attempting to articulate and we clarify by means of this opinion that holding.

To be clear, we are endeavoring here not to craft a new standard, but to articulate clearly the standard enacted in 1912. We find that the original understanding the word "loss" carried when the WDCA was enacted was its plain and ordinary meaning, consistent with how it had been construed in the context of insurance law. Thus, "loss" includes not only amputation but also loss of usefulness.[20] It was the intent of the drafters to write into the statute a word that was expansive enough to cover both situations and the words and language they chose conveyed this. Moreover, in our case law, this Court has with considerable consistency, albeit not unfailingly, upheld this construction. We do so again today, believing as courts have before us that the meaning we give to the word "loss" in MCL 418.361(2) is the meaning originally intended.

---

[20] In *Pipe, supra* at 530, and again in *Cain I, supra* at 524, we referred to this as anatomical loss or its equivalent.

25

Defendants' approach would require us to ignore the statutory drafters' and enactors' turn-of-the-twentieth-century understanding of the common and approved meaning of "loss" in favor of a purportedly different contemporary understanding, divorced from its roots. This we cannot do. We are not free to substitute any other nonstatutory definition of a word or term for the meaning it indisputably had in 1912, and has maintained for almost a century. This duty traces to the simple notion that we are to construe a statute "in the light of the circumstances existing at the date of its enactment, not in the light of subsequent developments. . . . 'The words of a statute must be taken in the sense in which they were understood at the time when the statute was enacted.'" *Wayne Co Bd of Rd Comm'rs v Wayne Co Clerk*, 293 Mich 229, 235-236; 291 NW 879 (1940), quoting 25 RCL, § 215, p 959. We therefore hold to the original meaning of the word "loss" in the specific loss provisions: it does not require severance and there can be a "loss" where the claimant suffers the loss of usefulness of the member.

In addition, we conclude that the WCAC properly applied the "uncorrected" standard. We discussed in *Cain I, supra* at 521-523, the propriety of applying the "uncorrected" standard to specific loss claims and the

26

"corrected" standard to total and permanent disability claims. We reaffirm that rule today.

The WCAC found the damage to Mr. Cain's left leg "equated with anatomical loss and that the limb retains no substantial utility." The WCAC's factual finding is, in essence, that he lost the usefulness of his leg. Because that factual finding is supported by competent evidence in the record, it must be affirmed. *Mudel, supra* at 701. The Court of Appeals erred when it grafted a loss of industrial use standard onto the factual findings of the administrative tribunal. Nonetheless, it reached the correct result with regard to plaintiff's benefit eligibility. Accordingly, plaintiff is eligible for specific loss benefits for the loss of his left leg.

### ANALYSIS: TOTAL AND PERMANENT DISABILITY

We next turn to analyze whether the WCAC correctly allowed plaintiff benefits under the total and permanent disability provisions, MCL 418.361(3). Our task in interpreting the Legislature's work is, if possible, to read the seven eligibility requirements in § 361(3) so as to read none of them out or as an unnecessary duplication of another. In particular, we must endeavor to harmonize the three provisions concerning legs and to read them in a way that does not make any of the language surplusage. *Jenkins v Patel*, 471 Mich 158, 167; 684 NW2d 346 (2004);

27

*State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). In short, we read the words in a statute together, to harmonize the meaning of the clauses and give effect to the whole. *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003).

Defendants argue that we cannot construe "[l]oss" in § 361(3)(b) to mean less than amputation because then cases of lost industrial use would fall under both § 361(3)(b) and § 361(3)(g), rendering the latter surplusage. We disagree. We find the proper construction of the word "[l]oss" in § 361(3)(b) is that it has the same meaning given it in § 361(2).[21] This conclusion is unsurprising, we believe, given the juxtaposition of §§ 361(2) and 361(3), which is itself a compelling reason to give them the same meaning. See, e.g., *Sibley v Smith*, 2 Mich 487, 491 (1853). Furthermore, doing so, as we will explain, causes no part of § 361(3) to be duplicative or nugatory. Dealing with § 361(3)(b) first, we find that using this definition of loss means that benefits are payable under this section not only when there is anatomical loss, but also when the limbs have no practical usefulness. Section 361(3)(g), on the other hand, as we discussed in *Cain I*, with its

---

[21] We note that this meaning would also apply in §§ 361(3)(c) and 361(3)(d).

28

reference to permanent and total loss of industrial use, calls the fact-finder to look to wage-earning capacity and the injured worker's ability to function in industry. As is apparent, these words demand something distinct from § 361(3)(b)'s simple inquiry regarding whether the legs or feet are amputated or have no practical usefulness. This means that what is covered under § 361(3)(b) may not be covered under § 361(3)(g). Stated more formally, §§ 361(3)(b) and 361(3)(g) cover different things and defining loss as we have here does not make either provision nugatory. An example may make this distinction clearer. If the legs are rendered useless but can be braced so as to make the performance of the job possible, there has been loss under § 361(3)(b) but no loss of industrial use under § 361(3)(g). This worker, indeed like Mr. Cain, would under this reading qualify for total and permanent disability benefits under § 361(3)(b) but not § 361(3)(g). Conversely, a worker whose legs have basic function, i.e., are practically useful, but whose legs have no industrial use even if braced (such as a ballerina), would qualify under § 361(3)(g) but not § 361(3)(b).

These examples limn that the "corrected" standard does not apply to § 361(3)(b), unlike § 361(3)(g). The reason is, as we explained in *Cain I*, that § 361(3)(g), with its utilization of permanent and total loss language, compels a

conclusion that if the condition is correctable, it is not permanent and total. *Cain I, supra* at 519-520. In fact, when this language appears elsewhere in § 361(3), such as in §§ 361(3)(a) and 361(3)(e), the doctrine of correctability also applies. Because there is no such permanent and total loss triggering language in § 361(3)(b), it follows that the requirement of looking to correctability is absent.[22]

In sum, Mr. Cain has clearly suffered the loss of his amputated right leg and the WCAC found that his left leg has "no substantial utility." That is, his leg has no practical usefulness. Thus, he has suffered a "loss of both legs" and falls within § 361(3)(b), qualifying for an award of total and permanent disability benefits under that provision.[23] Accordingly, the WCAC and the Court of Appeals decisions are affirmed.[24]

---

[22] Again, §§ 361(3)(c) and 361(3)(d) are similarly worded.

[23] We have read the concurrence and, to preclude potential confusion, only note that its conclusion is identical to ours.

[24] We also conclude that, although the WCAC made an error of law in its interpretation of § 361(3)(b), it was properly within its scope on remand to reach legal conclusions based on its reassessment of the facts. *Modreski v Gen Motors Corp*, 417 Mich 323; 337 NW2d 231 (1983). While the WCAC was precluded from reaching a
(continued…)

30

CONCLUSION

In conclusion, we find that Mr. Cain has suffered the specific loss of his left leg under MCL 418.361(2) and that he qualifies for an award of total and permanent disability benefits under MCL 418.361(3)(b).  Therefore, we affirm the decisions of the Court of Appeals and the WCAC.

Clifford W. Taylor
Michael F. Cavanagh
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

---

(…continued)
decision contrary to that of this Court, *Cain I* did not address the question whether plaintiff had suffered total and permanent disability under § 361(3)(b).  Although the WCAC's determination on remand that he met the requirements of § 361(3)(b) had the opposite outcome from its initial determination that he was not qualified under § 361(3)(g), its finding was based on a different legal theory.  We conclude that it did not err in addressing legal questions raised by its new factual determination.

31

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

SCOTT M. CAIN,

    Plaintiff-Appellee,

v                                                              No. 125111
                                             AFTER REMAND

WASTE MANAGEMENT, INC. AND TRANSPORTATION INSURANCE CO.,

    Defendants-Appellants,

and

SECOND INJURY FUND,

    Defendant-Appellee.

_____

SCOTT M. CAIN,

    Plaintiff-Appellee,

v                                                              No. 125180
                                             AFTER REMAND

WASTE MANAGEMENT, INC. AND TRANSPORTATION INSURANCE CO.,

    Defendants-Appellees,

and

SECOND INJURY FUND,

    Defendant-Appellant.

_____

## AFTER REMAND

WEAVER, J. (concurring).

I concur in the result of the majority opinion and its conclusions that plaintiff suffered a specific loss of his left leg under MCL 418.361(2)(k) and that he qualifies for an award of total and permanent disability benefits under MCL 418.361(3)(b). The word "loss," as used in both subsections of the statute, includes not only amputation but also those situations in which there is a loss of the usefulness of the limb or member.[1] As noted by Chief Justice Taylor, the Worker's Compensation Appellate Commission (WCAC) essentially found that on these facts, plaintiff lost the usefulness of his left leg and that he accordingly was entitled to specific loss benefits for the loss of his left leg under MCL 418.361(2)(k). *Ante* at 27-28. There is competent evidence to support the WCAC's factual finding and we must defer to the WCAC on this finding. *Mudel v Great Atlantic & Pacific Tea Co,* 462 Mich 691, 703; 614 NW2d 607 (2000). Further, plaintiff has suffered a "[l]oss of both legs" under MCL 418.361(3)(b) because his right leg has been amputated and he has lost the usefulness of his left leg. Consequently, he is entitled to total and permanent disability benefits.

---

[1] Dictionary definitions of the word "loss" include: "failure to preserve or maintain" and "destruction, ruin." *Random House Webster's New College Dictionary* (1997).

2

Therefore, I agree that the decisions of the WCAC and Court of Appeals should be affirmed.[2]

> Elizabeth A. Weaver
> Marilyn Kelly

---

[2] While I agree with some of the basic conclusions of the majority, as should be evident from the fact that I am concurring separately, I do not sign on to all of the lengthy analysis on which the majority relies to support its conclusions.