*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

DEONTON AUTEZ ROGERS,

Defendant-Appellee.

FOR PUBLICATION
January 7, 2020
9:00 a.m.

No. 346348
Wayne County Circuit Court
LC No. 18-006351-01-FH

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

GADOLA, P.J.

Plaintiff appeals by leave granted[1] the trial court's November 7, 2018 order granting defendant's, Deonton Autez Rogers's, motion to quash several counts of the information. Defendant was charged, as a third habitual offender, MCL 769.11; with discharging a firearm in a building causing physical injury, MCL 750.234b(3); discharging a firearm in a building causing serious impairment, MCL 750.234b(4); assault with a dangerous weapon (felonious assault), MCL 750.82; possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; felon in possession of a firearm (felon-in-possession), MCL 750.224f; fourth-degree child abuse, MCL 750.136b(7); and ethnic intimidation, MCL 750.147b. On defendant's motion, the trial court dismissed charges of discharging a firearm in a building causing physical injury, the discharging a firearm in a building causing serious impairment, and the ethnic intimidation. On appeal, plaintiff challenges only the trial court's dismissal of the ethnic intimidation charge. We affirm the trial court's order granting defendant's motion to quash the ethnic intimidation charge. We do so despite the fact the trial court's reasoning constituted legal error. As detailed in our opinion, the trial court reached the correct result, albeit for the wrong reasons.

---

[1] *People v Rogers*, unpublished order of the Court of Appeals, entered November 16, 2018 (Docket No. 346348).

-1-

# I. FACTS

This case arises out of an altercation between defendant and the victim, Kimora Steuball, on the night of July 23, 2018. Steuball is a transgender person, which she explained to the court means that she was assigned as a male at birth, and now identifies as a woman, living her life and presenting herself as such in society. On the night of the incident, Steuball went to a gas station in Detroit to make a purchase. Upon arrival at the gas station, she saw defendant inside the gas station with a woman. Steuball got in line and defendant began talking to her, using derogatory terms. According to Steuball, defendant made various offensive statements to her, including "you're a nigga." Steuball responded that "nigga is somebody that identifies themselves as a man, carry themselves as a man. I don't do that. I'm a transgender." Defendant then asked Steuball about her sex organs and asked Steuball if he could see "it." Steuball tried to ignore defendant, but he continued to make derogatory remarks, which Steuball described as "gay" in nature, and included calling her a man and asking to see her penis. Defendant then pulled out a gun and threatened to kill her. Steuball was frightened that defendant would follow through on his threat to kill her. The woman with defendant told defendant to leave Steuball alone and to leave the gas station. While defendant was speaking to Steuball, a child that had arrived in the car with defendant entered the gas station. Defendant subsequently walked in close proximity to Steuball, gun in hand, moving toward the exit. Steuball testified that she feared that defendant would turn around and shoot her before leaving the gas station. Steuball further testified that transgender people are often attacked and harmed and she feared for her life. Reacting to the threat from defendant, she grabbed at defendant's hand as he came near her in an attempt to get the gun away from him. A struggle between the two ensued during which Steuball never had control over the gun. During this struggle, defendant kept his finger on the trigger. At some point during the struggle, the gun fired into Steuball's left shoulder. Steuball was then able to grab the gun from defendant. The woman with defendant took the gun from Steuball and moved toward the exit. Defendant then ran to the gas station exit, whereupon the woman with defendant gave him back the gun. Defendant then got into his car and the child followed him out, climbing into defendant's car with him. Steuball was taken to the hospital, where she spent several days being treated for a shattered shoulder, including undergoing surgery.

At defendant's preliminary examination, surveillance footage was shown detailing the incident. Defendant objected to the court binding him over on the two discharging a firearm charges, asserting that he did not intentionally fire a weapon at Steuball. With regard to the remaining charges (including the ethnic intimidation charge), defendant conceded that there were "questions of fact for a jury." Relevant to the appeal at hand, the district court found that "transgender" fell within the statutory definition of "gender"[2] for purposes of the ethnic intimidation charge.

_____

[2] In a written opinion following the bindover the district court stated the following:

> Upon reviewing the ordinary, contemporary, and common meaning of "gender," the Court must conclude that a transgender person who is targeted based on their behavioral and social displays of gender, and the fact that the term gender

In the trial court, defendant filed a motion to quash the district court's bindover of the two discharging a firearm in a building charges and the ethnic intimidation charge. With respect to the ethnic intimidation charge, defendant argued that the prosecution failed to demonstrate that defendant committed a malicious physical act accompanied by a specific intent to harass Steuball because of her gender. In an amended motion to quash, defendant further contended that the ethnic intimidation statute did not apply to situations involving transgender parties. The trial court granted defendant's motion to quash, finding that with respect to ethnic intimidation the preliminary examination testimony established that Steuball, not defendant, caused the physical contact between the two by grabbing defendant's wrist. The trial court further found that "gender" is defined, for purposes of the Michigan Penal Code, to include only masculine, feminine, and neuter genders, and therefore, not transgender people, such that the ethnic intimidation statute did not apply.

As previously indicated, this Court granted the prosecution's application for leave to appeal the trial court's decision.

## II. STANDARD OF REVIEW

Whether a defendant's conduct falls within the scope of a criminal statute is a question of statutory interpretation, which is reviewed de novo. *People v Flick*, 487 Mich 1, 9; 790 NW2d 295 (2010). Additionally, "[a] district court magistrate's decision to bind over a defendant and a trial court's decision on a motion to quash an information are reviewed for an abuse of discretion." *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011), see also *People v March*, 499 Mich 389, 397; 886 NW2d 396 (2016) (a trial court's decision to quash an information is reviewed for an abuse of discretion). "An abuse of discretion occurs when a decision falls outside the range of reasonable and principled outcomes." *People v Zitka*, 325 Mich App 38, 43; 922 NW2d 696 (2018) (citation and internal quotation marks omitted). To the extent that a lower court bases its decision on a motion to quash an information on an interpretation of the law, our review of that interpretation is de novo. *March*, 499 Mich at 397. When a trial court makes an error of law it necessarily abuses its discretion. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013).

## III. ANALYSIS

Defendant was charged with ethnic intimidation under MCL 750.147b. The statute provides, in pertinent part:

---

encompasses the denotation of a range of identities, that a transgender person is protected under the Ethnic Intimidation Statute in Michigan.

Steuball was made fearful by the defendant's bias[-]related words and conduct. Defendant's assaultive actions were the result of his malicious intent to harass and intimidate. The defendant articulated bias against the victims' [sic] behavioral and social display of gender. Therefore, the defendant is bound over on Count 7, Ethnic Intimidation.

(1) A person is guilty of ethnic intimidation if that person maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following:

(a) Causes physical contact with another person.

(b) Damages, destroys, or defaces any real or personal property of another person.

(c) Threatens, by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that an act described in subdivision (a) or (b) will occur.

The most important goal of statutory interpretation is to discern and give effect to the intent of the Legislature. *Dowdy*, 489 Mich at 379. If a statute's language is clear and unambiguous, it must be enforced as written, and judicial construction is not required or permitted. *People v Gardner*, 482 Mich 41, 50; 753 NW2d 78 (2008).

Relevant to the instant matter, the word "gender" is not specifically defined within MCL 750.147b. The trial court opined that, irrespective of whether the prosecution brought the ethnic intimidation charge against defendant based upon sub (a) or sub (c) of that statute, the lower court made an error of law in binding defendant over on the charge "based on the wording of MCL 750.147b and the definition of 'gender.' " The trial court found that the word "gender" is defined in the Penal Code, at MCL 750.10, as excluding transgender and that, as such, reference to dictionary definitions of the word "gender" is impermissible. We thus begin our analysis with addressing whether the word "gender" in MCL 750.147b includes transgender people. We find that it does not, though for reasons wholly distinct from the trial court's rationale.

On its face, MCL 750.10 provides grammatical clarity and miscellaneous definitions for the entirety of the Michigan Penal Code. It states, in relevant part, that "[t]he masculine gender includes the feminine and neuter genders." It is readily apparent to this Court that the trial court was misguided in relying on that provision to conclude that transgender is not a part or subset of "gender" for purposes of the ethnic intimidation statute. For decades, this Court has stated its understanding that the purpose of this statute was to place the female gender on the same footing as men with regard to whom criminal statutes would apply. In *People v Gilliam*, 108 Mich App 695, 700; 310 NW2d 843 (1981), for example, this Court stated that the gender provision in MCL 750.10 "indicates a clear legislative intent that the Penal Code apply to females as well as males." In *People v Ghosh*, 188 Mich App 545, 546-547; 470 NW2d 497 (1991), this Court referenced *Gilliam*, stating that MCL 750.10 provides that the Michigan Penal Code "applies to both men and women." *Ghosh*, 188 Mich App at 546. Thus, we have consistently recognized that the legislative intent in enacting MCL 750.10 was simply to clarify that the penal code did not apply only to men, but also to women, even when only masculine pronouns are used.[3] MCL

---

[3] This Court notes that the other definitions listed in MCL 750.10 address similar grammatical rules of broad inclusion such as "The singular number includes the plural and the plural includes the singular," and "The words 'person', 'accused', and similar words include, unless a contrary

750.10 establishes only a rule of grammar intending to explain that persons of the male sex are not the *only* people subject to the Michigan Penal Code. We therefore conclude that the trial court erred as a matter of law in finding that the provisions of MCL 750.10 establish a substantive, strictly limited definition of "gender," to be used throughout the Penal Code.

This does not end our inquiry, however. We must still determine whether intimidation on the basis of a person's "gender" in the ethnic intimidation statute, which was enacted in 1988, includes intimidation on the basis a person is transgender. Normal rules of statutory construction aid us in that effort. "If a statute specifically defines a term, the statutory definition is controlling." *People v Lewis*, 302 Mich App 338, 342; 839 NW2d 37 (2013). However, when "terms are not expressly defined anywhere in the statute, they must be interpreted on the basis of their ordinary meaning and the context in which they are used." *Id.*, quoting *People v Zajaczkowski*, 493 Mich 6, 13; 825 NW2d 554 (2012). Additionally, when a term is not defined in a statute, the dictionary definition of the term may be consulted or examined because this assists the goal of construing undefined terms in accordance with their ordinary and generally accepted meanings. *Lewis*, 302 Mich App at 342.

Because the word "gender" is not defined within the ethnic intimidation statute, we may consult dictionary definitions of the word to determine what is included within its meaning. This is not, however, a simple matter of picking up a contemporary dictionary, as the district court appears to have done in making its bindover decision, to determine the meaning of a term enacted into law in 1988. This is because our task as judges is to determine what the statute meant at the time the people adopted it, not what it might mean under an evolved understanding of the statutory language more than 30 years following its enactment. *Cain v Waste Mgt, Inc (After Remand)*, 472 Mich 236, 247; 697 NW2d 130 (2005) (looking to dictionary definitions from the era of the original legislation in construing the meaning of an undefined statutory term). See also *People v Wood*, 326 Mich App 561, 571; 928 NW2d 267 (2018) ("The Michigan Supreme Court has recognized the importance of defining a statutory term according to its original meaning.") That we must look to the meaning of statutory words and phrases as they would have been understood at the time of their enactment was aptly stated in *In re Certified Question*, 499 Mich 477, 484-485; 885 NW2d 628 (2016). In discussing resort to a dictionary definition of a statutory term, our Supreme Court stated, "[i]n this regard, it is best to consult a dictionary from the era in which the legislation was enacted. . . . Because the PPPA was enacted *in 1988*, we consult dictionaries from that era to define those words." *Id.* at 484-85, citing *Cain*, 472 Mich at 247 (emphasis added).

To do otherwise would allow a statute's meaning to change not as a result of statutory amendment, but rather by judicial fiat based upon evolving societal understandings of a statutory term or terms. This approach would be particularly problematic in the area of criminal law, where it would pose serious due process concerns. As this case well illustrates, allowing a criminal prohibition to change meaning based on nothing more than society's more "modern" or

---

intention appears, public and private corporations, copartnerships, and unincorporated or voluntary associations."

"contemporary" understanding of a statute's terms would lead to turning what yesterday was not criminal into something that today is criminal, but without notice to the public. And likewise, that which was criminal yesterday could become legal today without any intervening change in the law. It is to avoid such anomalies that we must look to the meaning of words at the time they were enacted to determine whether certain conduct is illegal. And when we conclude that certain conduct, reprehensible as it is, is not prohibited under the law as it exists, it is up to the Legislature, not the judges of this or any other court, to specify that illegality.

In this case, we must determine whether intimidation on the basis of a person's "gender" in the ethnic intimidation statute encompasses intimidation motivated by the fact a person is transgender. It is undoubtedly the case, as our dissenting colleague points out, that a contemporary definition of the term "gender" includes gender identity and transgender. But the statute was not enacted in the modern era when these definitions and understandings have taken hold. Rather, the people's representatives in the Legislature enacted this statute in 1988, and it took effect on March 30, 1989. What, then, was the common understanding of the term "gender" when the Legislature criminalized ethnic intimidation?

Webster's Ninth New Collegiate Dictionary, published in 1990, gives a one-word definition of the word gender, as follows: "SEX." This is the only definition given of the word in noun form that bears upon sexual identity, the others relating to the grammatical meaning of the term. The Random House College Dictionary, published in 1988, after likewise defining the word as a grammatical term, gives the same one-word definition: "sex". Both dictionaries then illustrate this meaning by using the word in a phrase involving "the feminine gender." The word "sex" was at that time, and remains today, associated with the biological roles of male and female. The Webster's dictionary previously referenced first defines "sex" as, "either of two divisions of organisms distinguished respectively as male or female." At the time the statute was enacted, therefore, the term "gender" was synonymous with sex, being the biological roles of male and female.[4]

---

[4] The concurrence/dissent quotes a partial definition of the word "gender" from *The Random House Dictionary of the English Language* (1971). A review of that entire definition, however, indicates that the statement is part of a discussion of the use of the word "gender" in a grammatical context, while the next definition in the entry describes gender simply as "sex." That dictionary entry more completely states "1. *Gram.* a. (in many languages) a set of classes that together include all nouns, membership in a particular class being shown by the form of the noun itself or by the form or choice of words that modify, replace, or otherwise refer to the noun, as, in English, the choice of *he* to replace *the man*, of *she* to replace *the woman*, of *it* to replace *the table*, of *it* or *she* to replace *the ship*. The number of genders in different languages varies from two to more than twenty; often the classification corelates in part with sex or animateness. The most familiar sets of genders are of three classes (as masculine, feminine, and neuter in Latin and German) or of two (as common and neuter in Dutch, or masculine and feminine in French and Spanish). b. one class of such a set. c. such classes or sets collectively or in general. d. membership of a word or grammatical form, or an inflectional form showing membership, in

That this was the common understanding of the term "gender" at the time the statute was enacted is further illustrated by a 1993 opinion of this Court. In *Barbour v Dep't of Social Services*, 198 Mich App 183; 497 NW2d 296 (1993), this Court upheld the trial court's dismissal of the plaintiff's claim that he was unlawfully discriminated against in his employment on the basis of his sexual orientation. Plaintiff brought his claim under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101, *et seq.*, which prohibits various forms of discrimination on the basis of "sex." The Court held that "harassment or discrimination based upon a person's sexual orientation is not an activity proscribed by the act." *Barbour*, 198 Mich App at 185. The Court went on to state, "Plaintiff has failed to meet the requirement that the harassment be *gender-based.*" *Id*. at 186 (emphasis added). The Court also relied upon its review of federal case law interpreting Title VII of the federal Civil Rights Act of 1964, 42 USC 2000e *et seq.*, which similarly prohibits discrimination on the basis of "sex," concluding that Title VII's "protections are aimed at *gender* discrimination, not discrimination based on sexual orientation." *Barbour*, 198 Mich App at 185 (emphasis added). As can be seen, the court in *Barbour* used the term "gender" interchangeably with the statutory term "sex." This strongly suggests that gender, at least through the early 1990s, held the same meaning as sex, which has long been understood to denote biological sex (i.e., male or female).

There is simply no indication that the term gender would have been understood to encompass one who is a transgender person when this statute was enacted in 1988. Indeed, in 1988 the general public may not have understood the meaning of the term "transgender," which was then newly in use in the media.[5] See Oxford English Dictionary. Instead, the public would have understood the term gender to be synonymous with biological sex, just as this court did in *Barbour*.[6]

A review of the legislative history of the ethnic intimidation statute is also instructive.[7] House Bill 4113, which became Public Act No. 371 of 1988, was introduced on February 12,

---

such a class. 2. sex: *She always minced her words when referring to persons of the feminine gender.* 3. *Archaic.* kind, sort, or class. (italics in original).

[5] This would be in contrast to the terms "transsexual," which would then have been understood to mean someone who had physically transitioned from one sex to the other, or "transvestite," which was then understood to mean a person who adopts the dress and behavior of a person of the opposite sex. *Webster's Ninth New Collegiate Dictionary* (1990).

[6] The term "transgender" did not work its way into an opinion of this court until 2008. See *People v Lee*, unpublished per curiam opinion of the Court of Appeals, issued September 16, 2008 (Docket Nos. 277551, 27552). The term first appeared in a published decision of this court in 2015. See *Shirvell v Attorney General*, 308 Mich App 702, 745; 866 NW2d 478 (2015).

[7] We do not resort to legislative history when the meaning of a statute is clear on its face. *In re Certified Question*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). In this case, uncertainty over whether the statute prohibits intimidation on the basis that a person is transgender, derived from competing definitions of the term gender, warrants a resort to legislative history. "This Court

1987. As introduced, the bill stated that a person is guilty of ethnic intimidation if the person engages in certain conduct that is motivated "by reason of the race, color, religion, or national origin of the victim or victims." Notably, there was no mention of either gender or sexual orientation when the bill was first introduced. Before final passage of the bill in the House of Representatives a substitute (H-4) was adopted, which added the term "sexual orientation" to the list of prohibited motivations, and the bill was then approved and advanced to the Senate. The House remarkably did not include either gender or sex in its list of prohibited motivations. The Senate then proceeded to adopt a substitute (S-2) that exchanged the term "gender" for "sexual orientation," along with other changes. This version was returned to the House, which concurred in the Senate amendments, enrolled the bill, and sent it to the Governor, who signed it into law. The statute remains unchanged since that time.[8]

To conclude that the term "gender," adopted in 1988 in place of the term "sexual orientation," included the modern-day understanding of what it is to be a transgender person, strains credulity.[9] A Legislature that in 1988 appears to have been unwilling to criminalize behavior motivated by the sexual orientation of the victim cannot reasonably be thought to have intended instead to criminalize conduct based on a person being transgender, a term that was not in use at that time in the jurisprudence of our State and had only recently emerged in the media. Instead, it is most certainly the case that the inclusion of the term gender was meant, as contemporaneous dictionary definitions and court rulings strongly suggest, to criminalize certain conduct motivated by the biological sex of the victim. We are constrained to reach this

---

has recognized the benefit of using legislative history when a statute is ambiguous and construction of an ambiguous provision becomes necessary." *Id*.

[8] When attempting to ascertain legislative intent, not all legislative history is equally valuable. *In re Certified Question*, 468 Mich at 115 n 5; *In re Reliability Plans of Electric Utilities*, 325 Mich App 207, 229; 926 NW2d 584 (2018). Our Supreme Court has instructed that "the highest quality [of] legislative history [is] that [which] relates to an action of the Legislature from which a court may draw reasonable inferences about the Legislature's intent with respect to an ambiguous statutory provision" including "actions of the Legislature in considering various alternatives in language in statutory provisions before settling on the language actually enacted." *In re Certified Question*, 468 Mich at 115 n 5. This is the only form of legislative history we have relied upon in crafting our decision in this case.

[9] Congress, enacting comparable hate crimes prevention legislation, specifically prohibited bodily injury or attempted bodily injury to any person because of actual or perceived "religion, national origin, *gender*, *sexual orientation*, *gender identity*, or disability . . . ." 18 USC 249 (emphasis added), suggesting that Congress, at the time of the enactment of that statutory provision in 2009, did not consider the term "gender" to include sexual orientation or gender identity.

conclusion because we must take this term as it was understood in 1988, not through the lens of a modern-day interpretation.[10]

In this case, the defendant's reprehensible actions toward the victim were motivated by the fact the victim is a transgender person. When the defendant asserted that the victim is a man, the victim responded very specifically by saying that she does not identify as a man or carry herself as a man. Instead, she told defendant, "I'm a transgender." Defendant's conduct escalated from there, with defendant eventually pulling a weapon and threatening to shoot Steuball, which he then did during the course of a struggle over the gun. Thus, defendant's actions were not motivated by Steuball's biological gender, but rather resulted from the fact that Steuball identified herself as a transgender person. As such, defendant's outrageous conduct does not fall within the ambit of the ethnic intimidation statute as it is now written. The district court erred in binding defendant over for trial on the basis of a "contemporary" definition of the term gender. The trial court therefore reached the correct result in quashing the bindover, albeit for the wrong reasons, and therefore did not abuse its discretion.

The concurrence/dissent states that the Legislature's intent in enacting the ethnic intimidation statute "can be gleaned from the language of the statute itself that it is intended to criminalize harassing and intimidating behavior when the behavior is based on a victim's specific characteristics." As the concurrence/dissent then notes, the statute itself identifies those categories to which the statute applies, being race, color, religion, gender, or national origin. The concurrence/dissent further states that "[o]ur role is to effectuate the intent of the Legislature," that the intent of the Legislature would be effectuated by our "recogniz[ing] that the victim here was targeted because of her gender," and that our recognition of this would have "an important role in effectuating the Legislature's intent - to criminalize and punish hate-based or discriminatory intimidation and harassment." On this latter point, we must disagree.

MCL 750.147b does not seek to criminalize and punish hate-based or discriminatory intimidation and harassment generally; rather, that statute seeks to criminalize and punish a person guilty of ethnic intimidation, which the statute defines as a person who "maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin" engages in the conduct proscribed by the statute. A person does not violate the statute simply by behaving reprehensibly or hatefully. Even when a person's reprehensible conduct is inspired by hatred or prejudice toward a particular group of people, the statute still has not been violated, unless that group of people is one of the categories included in

---

[10] Not only have the Michigan Supreme Court and this Court made clear our obligation in this regard, see *In re Certified Question*, 499 Mich at 484-485, but the United States Supreme Court has repeatedly engaged in statutory interpretation by resort to dictionary definitions at the time of a statute's enactment. See, e.g., *Taniguchi v Kan Pacific Saipan, Ltd*, 566 US 560, 566-568; 132 S Ct 1997; 182 L Ed 2d 903 (2012) (consulting dictionaries in use in 1978, the year of enactment of the Court Interpreters Act, to ascertain the meaning of "interpreter." See also, e.g., *Smiley v Citibank*, 517 US 735; 116 S Ct 1730; 135 L Ed 2d 25 (1996) (consulting "dictionaries of the era" of the National Bank Act to interpret the term "interest."

the statute by our Legislature. Thus, to ascertain whether a person is guilty of ethnic intimidation, we must determine whether that person was motivated by another person's race, color, religion, gender, or national origin.

We agree with the concurrence/dissent that "[o]ur role is to effectuate the intent of the Legislature." However, the intent of the Legislature that enacted this statute cannot be effectuated by our "recogniz[ing] that the victim here was targeted because of her gender." Defendant did not assault the victim because she was biologically male. Indeed, defendant did not direct his attack toward any other person present based on whether they were male or female. Rather, defendant directed his attack at the victim because she is a transgender person. The Legislature's intent was not, as the concurrence/dissent advocates "to criminalize and punish hate-based or discriminatory intimidation and harassment." Rather, the intent of the Legislature was to punish ethnic intimidation as set forth in the statute. Indeed, much of the criminal behavior that we observe is hate-based and intended to intimidate and harass. A person only violates the ethnic intimidation statute, however, if his or her behavior falls within the parameters of that statute.

As the concurrence/dissent observes, "the proper role of the judiciary is simply to apply the terms of the statute to the facts of the particular case." *Smitter v Thornapple Twp*, 494 Mich 121, 129; 833 NW2d 875 (2013). More precisely, our Supreme Court in *Smitter* stated that "[*w*]*hen the statutory language is unambiguous*, the proper role of the judiciary is simply to apply the terms of the statute to the facts of the particular case. In addition, words used by the Legislature must be construed and understood in accordance with their common, ordinary meaning." *Id*. (emphasis added). In so doing, we observe that our Legislature did not include the term "transgender" in the statute, quite possibly because at the time the statute was enacted the term was only just entering the public and jurisprudential lexicon. For the same reason, we cannot make the leap that by using the term "gender" our Legislature meant "transgender." We conclude that defendant did not target the victim because she is biologically male; he targeted her because she is a transgender person, which is not within the statute's ambit.

By any measure of human decency, the defendant's treatment of the victim in this case was abhorrent, and Steuball deserves the protection of the law. Our judicial role, however, does not permit us to extend that much-deserved protection to her in this case. If intimidation motivated by the fact a victim is a transgender person is to be criminalized, as many of us would readily agree it should be, this must be the work of the people's elected representatives in the Legislature, not this panel of judges. Our judicial oath simply does not empower us to amend the criminal law in this fashion, however satisfying the result might be.

Affirmed.

/s/ Michael F. Gadola
/s/ James Robert Redford